**DEFENDANT'S SECOND MOTION TO COMPEL**                              **EXHIBIT A**

Case 1:04-cv-00125-JJF-MPT   Document 79-2   Filed 03/08/2005   Page 2 of 7

| Spoltore | | Wilmiington Professional |
|---|---|---|
| Neil S. Kaye, M.D. | v.<br>C.A. # 04-125 JJF | January 20, 2005 |

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANDREA L. SPOLTORE,            )
f/k/a ANDREA L.                )
CADWALLADER,                   )
                               )
          Plaintiff,           ) Civil Action
                               ) No. 04-125 (JJF)
     v.                        )
                               )
WILMINGTON PROFESSIONAL        )
ASSOCIATES, INC.,              )
                               )
          Defendant.           )

  Deposition of NEIL S. KAYE, M.D., taken pursuant to notice at the offices of Dr. Kaye, 5301 Limestone Road, Suite 103, Wilmington, Delaware, beginning at 9:04 a.m., on Thursday, January 20, 2005, before Julie H. Parrack, Registered Merit Reporter and Notary Public.

APPEARANCES:

  KIMBERLY D. SUTTON, ESQUIRE
  OBERMAYER REBMANN MAXWELL & HIPPEL LLP
   3 Mill Road, Suite 306A
   Wilmington, Delaware 19806
   On behalf of Plaintiff

  LAURENCE V. CRONIN, ESQUIRE
  SMITH KATZENSTEIN & FURLOW LLP
   The Corporate Plaza
   800 Delaware Avenue
   Wilmington, Delaware 19899
   On behalf of Defendant

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Page 2

1        NEIL S. KAYE, M.D.,
2      the deponent herein, having first been duly
3      sworn on oath, was examined and testified as
4      follows:
5  BY MR. CRONIN:
6  Q. Good morning, Dr. Kaye.
7  A. Good morning.
8  Q. My name is Larry Cronin. I represent the
9  defendant, Wilmington Professional --
10 A. Nice to meet you.
11 Q. It's nice to meet you. I represent the
12 defendant, Wilmington Professional Associates, in a
13 lawsuit that's brought by Andrea Spoltore. It's my
14 understanding that you're going to be testifying as an
15 expert at trial in that case. Is my understanding
16 correct?
17 A. I believe so.
18 Q. Okay. There are several pending motions in the
19 case, as I'm sure Miss Sutton has explained to you,
20 with respect to Ms. Spoltore's medical records. We're
21 proceeding with the deposition today with the
22 understanding that we may have to reconvene at some
23 later point pending resolution of those motions. But
24 in any event, we're going to go as far as we can today

Page 3

1  and see what we can learn about the basis for the
2  various opinions that I believe you'll be offering at
3  trial.
4      How did you become retained in this
5  matter?
6  A. It was either Miss Sutton or someone from her
7  firm contacted me and asked me if I was available to
8  review some records in a case that they had. And I
9  said yes, I am, and they sent me over some records,
10 which I reviewed, and then I eventually interviewed
11 Miss Spoltore.
12 Q. Okay, other than reviewing the records, were
13 you told anything else about the case or what
14 specifically you were going to be asked to offer an
15 opinion on?
16 A. Not that I recall. It's possible that in the
17 initial conversation I was told that it was a case
18 involving an individual who had been terminated from
19 her job, but certainly nothing more than that.
20 Q. Okay. So you then reviewed some records that
21 were sent to you, correct?
22 A. That's correct.
23 Q. And you reviewed those before you met with Miss
24 Spoltore, correct?

Page 4

1  A. Yes.
2  Q. Now, the records that you reviewed --
3      MR. CRONIN: And, Kim, if you want to jump
4  in here, the records that were provided to Dr. Kaye
5  are the same records you provided to me along with the
6  privileged log that you gave to me yesterday. Is that
7  correct?
8      MS. SUTTON: No, that's not correct.
9      MR. CRONIN: Were there additional
10 records?
11     MS. SUTTON: I gave him the full set that
12 was provided to me by Dr. Jackovic. But it's with a
13 HPPA release only to Dr. Kaye that certain
14 information, if it was totally irrelevant to this
15 case, was not to be disclosed.
16     MR. CRONIN: Okay. So in addition to
17 those documents that you provided yesterday, and in
18 addition to the documents that are identified on the
19 privilege log, there were additional documents
20 furnished to Dr. Kaye. Is that correct?
21     MS. SUTTON: Yeah, the documents that are
22 in the privilege log were produced to him.
23     MR. CRONIN: Right. Maybe I'm not making
24 myself clear, I know it's not your deposition. But

Page 5

1  just so we're working with the same set of documents,
2  it's my understanding that you produced to Dr. Kaye
3  the documents that you've produced to me originally
4  from Dr. Jackovic, and you also produced to him
5  unredacted copies of those documents as well as the
6  documents listed in the privileged log that you
7  provided yesterday.
8      MS. SUTTON: The way you phrased it isn't
9  correct. I gave him a full, unredacted set of
10 Dr. Jackovic's medical records.
11     MR. CRONIN: Okay.
12     MS. SUTTON: I didn't give him the
13 privileged log at that time.
14     MR. CRONIN: No, I understand that. But
15 the documents listed on the privilege log --
16     MS. SUTTON: Were provided to him with the
17 HPPA authorization that gave him a limited use of
18 those records.
19     MR. CRONIN: All right. But were there
20 any documents provided to Dr. Kaye that are not either
21 listed on the privilege log, nor were produced to me
22 yesterday?
23     MS. SUTTON: I think you can ask him that.
24 I mean --

Case 1:04-cv-00125-JJF-MPT   Document 79-2   Filed 03/08/2005   Page 4 of 7

Spoltore  
Neil S. Kaye, M.D.

v.  
C.A. # 04-125 JJF

Wilmiington Professional  
January 20, 2005

Page 6

1  MR. CRONIN: Okay, let's do it that way.
2  THE WITNESS: Be helpful if I just tell
3  you what I've reviewed? Which is what I've listed.
4  BY MR. CRONIN:
5  Q. Well we'll start it that way, but I need to,
6  you know, in the ordinary course, I would ask for your
7  file, and since I haven't been provided that, I'm
8  trying to get a sense of what it is you have.
9      What were you provided with?
10  A. Okay, what I have reviewed is the complaint,
11  the Delaware Department of Labor Division of
12  Unemployment Insurance Appeals decision, the EEOC
13  determination, the report from Dr. Jackovic, that's
14  J-a-c-k-o-v-i-c, and the records themselves from
15  Dr. Jackovic also referred to as Health Care Center at
16  Christiana.
17  Q. Right.
18      MR. CRONIN: Could you mark this, please.
19      (Kaye Deposition Exhibit No. 1 was marked
20  for identification.)
21  Q. Dr. Kaye, I'm going to hand you what's been
22  marked as Kaye No. 1. Do you recognize that document?
23  A. Yes, I do.
24  Q. And is that the transmittal letter that was

Page 7

1  sent along with the documents that were provided from
2  Miss Sutton's office?
3  A. As far as I know, this first page would have
4  been the cover letter that came with the original
5  records, yes.
6  Q. Okay. Now, were you provided any documents in
7  connection with this case, other than what came along
8  with this letter, this undated letter?
9  A. I have received a redacted version of
10  Dr. Jackovic's report dated 10-7-04. And I believe
11  that's it.
12  Q. Okay, when did you receive the redacted form of
13  the Dr. Jackovic October 7 report?
14  A. Received the redacted version today.
15  Q. Okay. Could I see the redacted version that
16  you got today, please?
17  A. This is it.
18      Actually, I need to correct that answer.
19  This must be my copy of a redacted version of more
20  medical records, or among medical records.
21  Q. Okay, so you received another set of redacted
22  medical records?
23      MS. SUTTON: Objection to the form.
24  A. This is not another set, it's just, it's the

Page 8

1  only set I got a redact -- I got today the redacted
2  report, a redacted set of records.
3  Q. Okay. So it's a redacted form of the records
4  that were previously provided to you?
5  A. Correct. Correct, as far as I know, there is
6  no additional records. They are simply redacted, it's
7  a redacted copy or redacted version of the complete
8  set that I had previously received.
9  Q. Okay. What's your understanding of the purpose
10  for the redactions?
11  A. I'm not a lawyer, but my understanding is that
12  records can be redacted, meaning having parts removed,
13  blacked out or whatever to preserve confidentiality,
14  to keep irrelevant material out of a case; or it may
15  be information in records that does not relate to the
16  case or even the individual themselves, and that with
17  the importance of trying to maintain confidentiality,
18  that the law allows for records to have, to have
19  sections redacted that just are not --
20  Q. Okay, I understand what redaction means
21  generally, and I'll ask a more specific question.
22  What's your understanding for the purpose of the
23  redactions in this case?
24  A. I think that they're the same thing I just

Page 9

1  said, that they are to remove parts of the record that
2  are not relevant to the legal question itself.
3  Q. Did you provide any advice with respect to what
4  should be redacted from these records?
5      MS. SUTTON: The medical records?
6      MR. CRONIN: Right.
7  A. I did not provide any advice regarding the
8  redaction in medical records.
9  Q. Okay. I'm going to hand you a document. I
10  don't have copies, so we're not going to mark it. But
11  it's a copy of the letter that I received from
12  Ms. Sutton yesterday enclosing a number of documents,
13  some of which have been redacted. But I'd like to ask
14  you by looking through that document if you can tell
15  me, were you provided with any additional medical
16  records regarding Ms. Spoltore which are not contained
17  in that packet or otherwise listed in the privileged
18  log which is at the beginning of that stack of
19  documents shortly after Miss Sutton's letter?
20      MS. SUTTON: You're talking about medical
21  records?
22      MR. CRONIN: Correct.
23  A. I don't think so. It's a pretty thick stack
24  here, but I don't think there's any great difference.

Page 10

1   MR. CRONIN: Do you know if there's any
2  difference?
3   MS. SUTTON: No, it's exactly the same, as
4  far as I know.
5   MR. CRONIN: That's what I'm trying to get
6  on the record.
7   (Kaye Deposition Exhibit No. 2 was marked
8  for identification.)
9  Q. Okay, Dr. Kaye, you've had handed to you what's
10 been marked as Kaye No. 2. Do you recognize this
11 document?
12 A. Yes, I do.
13 Q. Okay. And what is that?
14 A. This would be the 10-19-04 letter that I wrote
15 to Ms. Sutton after I had seen Ms. Spoltore.
16 Q. Okay. Did you do any drafts of this letter
17 before putting this in final?
18 A. No, I don't work in draft form really.
19 Q. Okay. And even though it's unsigned, is this
20 your final report?
21 A. Yes.
22 Q. Did you discuss this report, the writing of
23 this report with Ms. Sutton before you wrote it?
24 A. I discussed briefly with her what type of, what

Page 11

1  type of report she wanted from me.
2  Q. Okay. And was this after your interview with
3  Miss Spoltore?
4  A. Yes.
5  Q. And was it also after your review of the
6  medical records and other documents that were provided
7  to you?
8  A. Yes, I reviewed the records and documents
9  first, then saw Miss Spoltore, and I spoke with
10 Ms. Sutton and asked her what form she'd like my
11 opinions in.
12 Q. Okay. Now, prior to that conversation with
13 Ms. Sutton, did you have any other discussions with
14 Ms. Sutton, other than what you've previously
15 testified to as with her or someone from her office
16 when you were initially engaged in this matter?
17 A. I don't think so.
18 Q. Okay. Tell me about the conversation you had
19 with Ms. Sutton prior to putting this report together.
20 A. Well, I called her, I told her that I had been
21 through the records, that I had seen her client, and
22 that I had reached my opinions, and told her briefly
23 what my opinions were, and asked her if she would like
24 a report. She said she would like me to put that in,

Page 12

1  into a letter to her, which I did, and sent that off
2  to her.
3  Q. Okay. What did you tell her your opinions
4  were?
5  A. I told her my opinions were that Miss Spoltore
6  was depressed and anxious as a direct result of her
7  termination at WPA; that I thought it had a clear
8  medical and psychiatric effect on her client; that she
9  then sought appropriate treatment via her primary care
10 doctor, Dr. Jackovic, who also diagnosed the anxiety
11 and depressive disorder, started her on medication
12 which was appropriate. And that she took her
13 medication, and after a few months was doing
14 reasonably well and was back on her feet and at work.
15 And that I felt that the time she had been off work
16 and the medical, psychiatric symptoms that she
17 experienced were a direct result of the termination.
18 Q. Any other opinions?
19   MS. SUTTON: Objection to the form.
20 Opinions that he was expected to testify to?
21 Q. Well, any other opinions that you discussed
22 with Ms. Sutton prior to putting this report together.
23   MS. SUTTON: And I'm going to object to
24 the extent he's required to disclose confidential

Page 13

1  information that's not relevant to this case.
2  Q. Okay, but I'm still asking the question, and
3  if, Dr. Kaye, you choose not to answer, you can say
4  you choose not to answer on the record and we'll deal
5  with that subsequent to the deposition.
6  A. I think I'd like to limit my opinions to the,
7  to what occurred at work and the wrongful termination
8  and then her response, her treatment. Essentially I
9  feel I have put brackets, time brackets on my opinions
10 with the beginning when she was terminated on 3-6. I
11 think my letter is clear that my right-hand bracket
12 that the issue, as I see it, ended by 5-9-02.
13 Q. Okay. So in your view, that this medical and
14 psychiatric effect caused by the termination of
15 Ms. Spoltore occurred from the period of March 6, 2002
16 through May 9, 2002?
17 A. Right, that's the period that she was I think
18 most affected, because by 5-9-02 she was able to
19 resume employment. And that although I think she
20 still experiences feelings of shame, humiliation, loss
21 of confidence related to how she was terminated and
22 her inability to get a new job with, with similar
23 wages and benefits, and that that can serve as a
24 reminder of what occurred, that the psychiatric

Case 1:04-cv-00125-JJF-MPT    Document 79-2    Filed 03/08/2005    Page 6 of 7

| Spoltore | v. | Wilmiington Professional |
|---|---|---|
| Neil S. Kaye, M.D. | C.A. # 04-125 JJF | January 20, 2005 |

### Page 14

1  treatment that she received is actually limited to
2  that time period.
3      Q.  Well, just so I understand, I understand the
4  latter part of your answer to say that the psychiatric
5  treatment that she received that related to the injury
6  that you believe she suffered, the medical and
7  psychiatric injury she suffered as a result of her
8  termination occurred between March 6, 2002 and May 9,
9  2002.  Is it your opinion that she continued
10 subsequent to May 9, 2002 to suffer from either a
11 medical or psychiatric injury?
12         MS. SUTTON:  Objection to the form.
13     A.  Can I get you to rephrase the question?
14     Q.  Sure.  You've explained, and certainly as I
15 understood the latter part of your answer, is that the
16 treatment that Ms. Spoltore received in connection
17 with the medical and psychiatric injury that you've
18 described as being causally related to her
19 termination, that occurred during that time frame.
20 What I'm asking you, is it your opinion that she
21 continued to suffer either medical or psychological
22 injury after May 9th, 2002 as a result of her
23 termination on March 6, 2002?
24         MS. SUTTON:  Objection to the form.

### Page 15

1     A.  In medicine and in psychiatry, a person has to
2  have a certain number of symptoms at a certain
3  intensity for a certain duration in order to be
4  diagnosed.  Once the symptoms decrease in severity so
5  that they no longer meet the criteria, then the
6  diagnosis ceases.  So a person could continue to have
7  symptoms but not to the degree that they reach a
8  diagnosis.  And again, by 5-9, I do not believe that
9  she is so symptomatic that the diagnosis should be
10 continued, but it is certainly realistic that she
11 could have ongoing symptoms that would relate to this.
12 And in fact, during the time of litigation it would be
13 very normal and usual for somebody to be, to have sort
14 of a flare-up in symptoms simply related to litigation
15 or having to go through questioning and all over, over
16 once again.
17     Q.  Okay.  What is the diagnosis that in your
18 opinion existed from March 6, 2002 until May 9, 2002?
19     A.  Dr. Jackovic used the diagnosis of a
20 situational anxiety and depression, which is a
21 reasonable diagnosis.  Translating that into more
22 technical psychiatric jargon, that would be more
23 consistent with what we call an adjustment disorder
24 with mixed anxiety and depression.

### Page 16

1     Q.  Okay, is there like a DSM-IV number that you
2  would assign to what you believe to be her --
3     A.  That would be 309 series.
4     Q.  Now just so the record is clear, you also
5  recall during this conversation that you had with
6  Ms. Sutton prior to doing your report a discussion
7  about other issues with respect to Ms. Spoltore's
8  mental health, correct?
9         MS. SUTTON:  That's a yes or no.
10    A.  Yes.
11    Q.  Okay.  And turning to your report in the last
12 sentence of the last full paragraph of the first page,
13 you write, "I do not believe that subsequent mental
14 health issues that appear in the record are related to
15 the job termination."  Do you see that?
16    A.  Yes, I do.
17    Q.  And would it be fair to say that you and
18 Ms. Sutton discussed these subsequent mental health
19 issues during that conversation prior to creation of
20 this report?
21         MS. SUTTON:  Objection to the form.
22    A.  I'm not sure that we discussed them in any
23 great, to any great detail.  I'm fairly certain that
24 Ms. Sutton knows her client, and I also learned

### Page 17

1  information that I felt was irrelevant to the question
2  I was being asked, and so I put into this report that
3  opinion, that statement.
4     Q.  Are there any opinions that you expect to give
5  at trial or that you will give at trial that are not
6  contained within this report?
7     A.  At trial I only intend to answer the questions
8  under oath as truthfully as I can, and since I don't
9  get to ask the questions, I have to answer them.  It's
10 all a matter of what I get asked.  I don't have any
11 plans for anything.
12    Q.  Okay, do you have any opinions about Miss
13 Spoltore's condition or prognosis that are not
14 contained within this report?
15         MS. SUTTON:  Objection to the form.  Are
16 you talking about her condition that was in effect in
17 2002?
18         MR. CRONIN:  I'm just trying to get an
19 understanding of what Dr. Kaye is going to testify
20 about at trial.
21         MS. SUTTON:  Well, I have no objection to
22 you asking him any opinions or prognosis as to what
23 he's going to be testifying at trial, but not an
24 overall general opinion about Miss Spoltore's

Spoltore  
Neil S. Kaye, M.D.  
v.  
C.A. # 04-125 JJF  
Wilmiington Professional  
January 20, 2005

Page 18

1  prognosis about matters that are not relevant.
2    A.  I don't believe that my opinions regarding
3  diagnosis or treatment would be any different than
4  what I've stated. I've described some symptoms, given
5  a diagnosis and talked about her treatment. I don't
6  think that this report really addresses the issue of
7  prognosis. I was not asked to make any statement
8  about prognosis, so I guess if I am asked about
9  prognosis, I will need to formulate an opinion about
10 that and then answer that question should it arise.
11   Q.  Right. But your opinion, if I understand it
12 correctly, is that Ms. Spoltore suffered a medical and
13 psychiatric injury that was limited in duration from
14 March 6, 2002 until May 9th, 2002. Correct?
15   A.  That's correct.
16   Q.  Okay. Now, have you had any conversations with
17 Ms. Sutton or anyone on her behalf subsequent to the
18 conversation that you've described prior to writing
19 your report?
20   A.  No.
21   Q.  How about today? Did you meet with Ms. Sutton
22 today?
23   A.  We met for about five to 10 minutes this
24 morning, because that's when she got here because of

Page 19

1  traffic on the bridge and the ice on the roads. And
2  we spoke briefly, mostly focused on my understanding
3  of the redaction issue and clarifying the
4  confidentiality privilege issue.
5    Q.  Okay. Now this morning you provided me with
6  some typed notes that you have in the file. And
7  you've redacted these?
8    A.  Yes.
9    Q.  Okay, now, did you redact these at Ms. Sutton's
10 direction, or did you redact them on your own?
11   A.  I would say both.
12   Q.  Well were they redacted before this morning?
13   A.  No.
14   Q.  And what was the purpose of these redactions?
15   A.  I had only learned about the whole redaction
16 issue yesterday. And so with that in mind, I looked
17 at my notes and realized that there were things in my
18 notes that should be redacted. And I asked Ms. Sutton
19 to verify that with me, and then produced a set of
20 redacted notes.
21   Q.  Now, other than these notes and the records
22 that were provided to you, both medical records and
23 other records and your report, is there anything else
24 in your file that relates to Miss Spoltore?

Page 20

1    A.  I believe there's a notice of the deposition,
2  probably a subpoena notice or a notice of deposition.
3  I think there is a, it may be a subpoena records
4  request from your office. I don't think there is
5  anything else that comes to mind.
6    Q.  Okay. Now, why don't you, if you would, tell
7  me about your interview of Ms. Spoltore that occurred,
8  according to the report, on October 19th, 2004. How
9  long was it?
10   A.  I spent about an hour and a half with her.
11   Q.  All right, and feel free to refer to your notes
12 if it will refresh your recollection, but what I'd
13 like you to do is basically take me through your
14 interview and examination of Miss Spoltore and let me
15 know what happened.
16   A.  Sure. I explained to her the purpose of the
17 evaluation, and that I was not going to be her
18 treating doctor, that I was asked to evaluate her for
19 a medical/legal purpose; and that the usual
20 doctor/patient things don't apply because in a
21 forensic setting I would appear at possibly a
22 deposition or court or in reports or talking with her
23 lawyer and things like that, and she understood, she
24 understood that. Then I asked her to tell me all the

Page 21

1  history of the present illness, what it is that
2  occurred, or simply start the story at the beginning
3  and bring me up to the present time. And she did just
4  that.
5         She told me that she had been working for
6  another medical billing company, and that in January
7  of '96 WPA acquired that company so she became an
8  employee of WPA, and that she continued to work for
9  them until the time of her termination, which was
10 March 6th, '02. She told me about her diagnosis of
11 spinal stenosis and disc herniations, and that she had
12 pain. She told me about a meeting on March 5th with
13 her supervisor and compliance officer to discuss
14 staffing issues that she had complained about. And
15 that she was basically stunned that she was fired the
16 following day.
17         She told me that she went to work for
18 Dr. Irving Berkowitz shortly thereafter, and that she
19 only worked for him for a short period of time because
20 the -- I believe that the lawyer who represented
21 Dr. Berkowitz also represented WPA, and thought that
22 there might be some conflict or a problem with her
23 going to work directly for him. And so he had to
24 rescind his job offer to her.