Page 22

1  She filed for benefits, feeling that she
2  was entitled. And the Delaware Department of Labor
3  agreed that she was entitled to benefits. She told me
4  about legal machinations that have taken place where
5  she has pursued her claim that she was wrongfully
6  terminated and discriminated against for a variety of
7  reasons, and that her complaints were validated,
8  ending eventually in a right-to-sue letter from the
9  EEOC.
10      She went to see her family doctor,
11  Dr. Jackovic on March 20th, and she was diagnosed with
12  an anxiety and depressive disorder. She was started
13  on standard antidepressant and antianxiety medication,
14  and tried to get her life together. She went forward
15  and were some changes in medication over time, wanted
16  to be working, was putting in job applications, and in
17  fact did secure another job. And that would get us up
18  to the 5-9-02 end bracket date.
19      Since that time there's continued to be,
20  as I said, the various legal machinations, ADA issues,
21  EEOC issues, and that's really why we're here at the
22  present time.
23      She talked a lot about how hard she had
24  worked for WPA and how dedicated she was to them, how

Page 23

1  she liked her job, thought that she did a good job,
2  worked on the biggest account, earned a good salary,
3  but often felt overwhelmed with the support and
4  staffing to handle so much. It's interesting in that
5  to note that after she was fired, it took two people
6  to replace her. So her claims that she was doing the
7  work of two people seem substantiated in my mind.
8      She was very concerned that her reputation
9  had been sullied in the process because the medical
10  billing community in Delaware is relatively small, and
11  she was told that part of her being fired was because
12  she was doing illegal things. And she told me that
13  she learned via Dr. Berkowitz that there was some
14  question as to whether or not there would be a federal
15  investigation or criminal charges, and really, that
16  her reputation had been significantly tarnished in the
17  process of her being fired and how that was done; that
18  it was a humiliating thing for her, it came as a
19  complete surprise and shock. She thought that she
20  should be able to talk to her supervisors in a
21  closed-door meeting about problems. And to have that
22  end in being fired the next day seemed wrong to her,
23  but made it difficult for her to think that she could
24  question and disclose things with other employers in

Page 24

1  the future because of how she was treated.
2      She felt she had not done anything wrong
3  or anything different from what other people in, in
4  the company were doing and that her superiors were
5  aware of what she was and had been doing and there had
6  never been any question about it.
7      She was very disappointed that she has not
8  been able to find another job that pays as well that
9  has as good benefits. Although she did get another
10  job, she was at the top of her game, probably earning
11  the most in her company and for somebody in her
12  position at WPA when she was terminated, and just has
13  never been able to replace that. And that's had an
14  effect on her as well in terms of finances, in terms
15  of medical benefits and health insurance, and in terms
16  of how she's had to interact with other people because
17  she has some ongoing fear, anxiety, fright about what
18  could happen to her in, with another employer, when in
19  fact it appears to her that she's been punished,
20  although she did nothing wrong.
21  Q.  Do you remember anything else from the
22  interview?
23  A.  Well, I'm sure there are -- I'm sure that
24  there's lots of small things, but I think that that

Page 25

1  gives a good picture of what it, of what she told me
2  in terms of the present illness. I learned things
3  about her past, her social history, what medications
4  she was taking, a little bit more about her medical
5  problems. Again, I think what's most relevant is her
6  experience of being terminated and her jobs going
7  forward.
8  Q.  Did she tell you anything about having
9  previously been treated for depression or anxiety?
10  A.  Yes, she did.
11  Q.  Okay. What did she tell you?
12  A.  She told me that she had been treated in the
13  past. Her husband had cancer, and during the time
14  that he was dying, she was depressed and anxious
15  probably. And she was started on medications for
16  that, and she took those until sometime after her
17  husband died, and by somewhere in, if my memory is
18  right, 1998, I believe. Yeah, by April of 1998 she
19  was off of those completely and was not taking regular
20  medications.
21      That's not an uncommon thing. I did not
22  think it was relevant for an individual of either sex,
23  male or female, it doesn't make any difference, to be
24  depressed and anxious while you're watching your

Page 26

1  spouse die of cancer. And that you're smart enough to
2  go and get some treatment for yourself to help you
3  cope with that is actually very healthy behavior.
4      Q.  Other than the treatment that she received in
5  connection with depression and anxiety prior to and
6  immediately after the death of her husband, did she
7  tell you about any other treatment she had received
8  for either anxiety or depression?
9      A.  I don't think I can answer that question.
10     Q.  Why don't you think you can answer?
11     A.  Because I think that that's part of what is,
12  what the confidentiality and privilege issue being
13  raised is about.
14          MS. SUTTON: Can I meet with him for a
15  minute?
16          MR. CRONIN: Sure.
17          MS. SUTTON: Just to discuss the privilege
18  issue.
19          (A brief recess was taken.)
20          MR. CRONIN: Why don't we read the
21  question back.
22          (The requested portion was read.)
23          MS. SUTTON: So these are treatments that
24  she received?

Page 27

1  BY MR. CRONIN:
2      Q.  Any treatment she received. Let's start with
3  that. Any treatment that she received prior to March
4  5th, 2002, in connection with depression or anxiety.
5          MS. SUTTON: And Larry, I'm going to ask
6  that it be limited to 10 years prior to her
7  termination. I don't see why anything other than that
8  would be relevant. I mean 10 years, come on.
9          MR. CRONIN: Well, the fact you want to
10  limit it to that concerns me somewhat, so I'm not
11  going to accept your limitation. If you're going to
12  direct the doctor or ask the doctor not to answer it,
13  that's fine, and he can respond however he chooses.
14     Q.  But what I'm trying to figure out is whether
15  she received treatment for either depression or
16  anxiety prior to March 5th or March 6th, 2002, other
17  than in connection with the passing of her husband.
18     A.  Not that I recall.
19     Q.  Are you aware of any diagnosis that she has
20  received that reflects that she suffered from either
21  depression or anxiety, at any time prior to March 6th,
22  2002, other than that related to the passing of her
23  husband?
24          MS. SUTTON: And I'm objecting to the form

Page 28

1  of the question. Are you saying diagnosis that
2  someone told him or that she told him?
3      Q.  Regardless of how you learned it, Dr. Kaye, are
4  you aware of any diagnosis that has been given to
5  Ms. Spoltore with respect to depression or anxiety for
6  the period prior to March 6, 2002 that was not in
7  connection with the passing of her husband?
8      A.  Not that I --
9          MS. SUTTON: I'm objecting to the form.
10  Go ahead.
11     A.  Not that I recall.
12     Q.  Are you aware of any treatment that
13  Ms. Spoltore has received for any mental disorder
14  prior to March 6, 2002, other than in connection with
15  the passing of her husband?
16          MS. SUTTON: Objection to the form of the
17  question.
18     A.  Not that I recall. I don't remember anything,
19  so no.
20     Q.  Are you aware whether Ms. Spoltore received any
21  treatment for substance abuse prior to March 6, 2002?
22     A.  I don't remember. Let me just --
23     Q.  Are you familiar with an organization called
24  Pace?

Page 29

1      A.  Yes, I am.
2      Q.  Okay, and what is Pace?
3      A.  Pace is an outpatient alcohol and drug
4  treatment facility.
5      Q.  Okay, are you aware whether or not Miss
6  Spoltore was ever an outpatient at Pace?
7          MS. SUTTON: Objection to the form. You
8  say prior to her termination?
9          MR. CRONIN: Correct.
10     A.  To the best of my knowledge, she was treated at
11  Pace.
12     Q.  When was she treated at Pace?
13     A.  I don't know the dates. I can't tell you that
14  from what I have in front of me.
15     Q.  Was that also in connection with her husband's
16  passing?
17     A.  I don't think so, but that's a guess. I don't
18  have the dates for that in front of me, so...
19     Q.  Turning back to your report, I'd like to ask
20  you about a couple of the statements that you've
21  included in it. You write in the second paragraph in
22  the second sentence, "As a direct result of this, she
23  became depressed and anxious, lost self-confidence and
24  felt shame and humiliation, as her employer, via

Case 1:04-cv-00125-JJF-MPT   Document 79-3   Filed 03/08/2005   Page 3 of 7

| Spoltore | v. | Wilmiington Professional |
|---|---|---|
| Neil S. Kaye, M.D. | C.A. # 04-125 JJF | January 20, 2005 |

Page 30

1  litigation, tried to make her feel that she had done
2  something wrong and likely criminal."
3        Q. What do you mean, "via litigation"?
4        A. What I mean is that after she was fired, her
5  employer continued to fight with her, tried to deny
6  her, prevent her from getting benefits, getting
7  involved in litigation which obviously is why we're
8  here today, you know, two plus years later. And so
9  that her employer taking this position has sent her a
10 clear message that they think that she did something
11 wrong. In, in those proceedings and in those
12 investigations, the employer's stance, as I understand
13 it, was that she was fired for cause because she had
14 done illegal things involving improper coding and the
15 like. And that in fact, the investigations found that
16 she had not done that. But forcing her to go through
17 those processes sends a clear message. And she felt
18 very close to the, to the employer, WPA. She had
19 worked for them for many years. And to have them turn
20 on her the way they did made her feel as badly as she
21 did.
22       Q. Okay. So by "via litigation" you're referring
23 to the fact that the company chose to oppose her
24 attempts to get unemployment and chose to defend

Page 31

1  itself in the lawsuit that she brought?
2        MS. SUTTON: Objection to the form.
3        A. Well, I think that's part of what I said, but
4  it's certainly not all of it. In the investigation
5  process, the employer --
6        Q. I'm sorry. I don't mean to interrupt you, but
7  just so I understand, what do you mean by the
8  "investigation process"?
9        A. Investigation, she had -- I believe that there
10 was a -- Department of Labor investigated, the EEOC
11 investigated, and people looked at the ADA issues and
12 the FMLA issues, and all of these are legal processes.
13 They're investigative things. People testify.
14 There's reports that are issued that I mentioned that
15 I had reviewed.
16       All of these things show that she would be
17 interviewed, her employer would be interviewed, and
18 that an attempt was made to portray her as having done
19 criminal things, miss -- you know, deliberately
20 miscoding and stealing from the government and the
21 system, and that's not what took place. And she in
22 fact was vindicated, but she certainly had every
23 reason to interpret those kinds of behaviors as being
24 directly targeted towards her, which they were.

Page 32

1        Q. Okay. Is it your opinion that what you've
2  described as the company's actions via litigation
3  resulted into the medical and psychiatric injury that
4  you've described?
5        MS. SUTTON: Objection to the form.
6        A. Yes, by giving her the message that what she
7  had done was wrong, was illegal, might be criminal.
8  When she went to work for Dr. Berkowitz and then felt
9  that his -- that he had to let her go because he was
10 told that she might be involved in something criminal
11 and there might be a big federal investigation,
12 absolutely that contributed to her depression and
13 anxiety and the need for treatment.
14       Q. Okay. But more specifically, the litigation
15 component, the fact that the company's taken positions
16 in litigation, is it your opinion that the positions
17 that the company has taken in litigation have helped
18 cause the psychological and medical injuries that
19 you've described as existing between March 6, 2002 and
20 May 9th, 2002?
21       MS. SUTTON: Objection to the form.
22       A. Yes, my answer is yes. We may have some
23 disagreement at what constitutes litigation. I don't
24 remember off the top of my head the dates that any of

Page 33

1  the specific legal documents were filed. But clearly
2  from the beginning this was a contentious, adversarial
3  legal process. If her employer had not terminated
4  her, because there appears to be no reason for her
5  termination, or if they had said she is just not a
6  good fit, we don't want you to work for us anymore but
7  we'll make it easy for you, we'll help you out, we'll
8  give you a severance package, do whatever, the outcome
9  would have been much different.
10       So the fact that this was adversarial from
11 the very beginning clearly is part of what caused her
12 to be psychiatrically and medically ill and to get
13 diagnosed and treated.
14       Q. Now, you reviewed Dr. Jackovic's report of
15 October 7th as part of your process in creating your
16 own report, correct?
17       A. Yes, I did.
18       Q. And you reviewed all of her records of her
19 treatment of Ms. Spoltore both before and after her
20 termination, correct?
21       A. Yes.
22       Q. How long has Dr. Jackovic treated Ms. Spoltore?
23       MS. SUTTON: Objection to the form. For
24 this one issue or in total?

Spoltore                                       v.                                 Wilmiington Professional
Neil S. Kaye, M.D.                   C.A. # 04-125 JJF                            January 20, 2005

Page 34

1    MR. CRONIN: Total.
2    A. I'm not sure that the records actually give us
3 an answer to that question. There are records that go
4 back into 2001, but I don't --
5    Q. Do you have her records from March 2nd, 2001?
6    A. March 2nd, 2001. Yes, I do.
7    Q. Okay. Do you see the first sheet of that?
8    A. Thank you for correcting me. So March 2nd,
9 2001 she says "new patient," so then that would be the
10 first day. I didn't catch that.
11   Q. Okay. If you look about halfway down that
12 first page, it said "has been through Pace 11, 12
13 years for alcoholism." Do you see that?
14   A. Yes.
15   Q. Okay. Was that something you discussed with
16 Ms. Spoltore during your interview of her?
17   A. Yes.
18   Q. Okay. What did she tell you about that?
19   A. That she had been treated for alcohol problems,
20 that she had gone to Pace, I remembered that. That it
21 had not impaired her in her working. That whatever
22 her problems were with drinking, that they were not
23 having any effect on her. She had never been fired,
24 as far as I know, for drinking on the job, didn't show

Page 35

1 up drunk at work or anything like that.
2    Q. So was it your understanding that the
3 alcoholism referred to in the reports was an issue in
4 the past and something that Ms. Spoltore had been able
5 to stop doing?
6       MS. SUTTON: Objection to the form.
7    A. Well, the medical view of alcoholism is that
8 it's a permanent condition, and that people, even if
9 they are not drinking, continue to be referred to as
10 alcoholics, albeit that they may be dry. And the real
11 question has to do with whether or not someone's
12 drinking impairs them in some way in terms of
13 socially, occupationally, is it having some problem
14 caused.
15       And again, the time that I'm interested in
16 is the time that she's working at WPA and then gets
17 terminated. And there's no indication, either from
18 her or in any of the records that I've seen, that
19 alcohol was an issue in that.
20   Q. Was it your understanding that she was still
21 drinking?
22       MS. SUTTON: Objection to the form.
23   Q. When you interviewed her, was it your
24 understanding that she was still drinking alcohol?

Page 36

1       MS. SUTTON: Objection to the form. When?
2 On the day of the interview?
3    Q. From the period of whenever she received the
4 treatment at Pace through the present.
5    A. Well these records would certainly suggest that
6 she did continue to drink. Just a couple lines above
7 that it says that she drinks socially.
8    Q. Okay. Now, when you were talking to her and
9 considering Dr. Jackovic's conclusions with respect to
10 what she diagnosed her from suffering from as a result
11 of the termination, did you consider any other
12 possible factors that may have caused this depression
13 or anxiety?
14   A. Absolutely.
15   Q. What other factors did you consider?
16   A. Everything else that comes to mind. I mean
17 we're always looking for what is the reason. So you
18 look for did your parents just die, did you just get
19 divorced, are you having financial problems or child
20 problems, other things in life that, you know, could
21 in some people sometimes contribute to depression.
22       There wasn't anything that really jumps
23 out. The fact is she was working, doing her job, not
24 in any kind of psychiatric treatment or counseling or

Page 37

1 anything. She gets fired, she experiences that
2 immediately, goes to her doctor, which she complains
3 to and her doctor's office is directly work related.
4 And that's what she gets treated for. So there's
5 nothing else that really jumps out at me as a good
6 explanation for this.
7       MR. CRONIN: Could you mark that, please.
8       (Kaye Deposition Exhibit No. 3 was marked
9 for identification.)
10   Q. Dr. Kaye, you've been handed what's been marked
11 as Exhibit 3, and I'll represent to you that these
12 appear to be the records from Dr. Jackovic starting on
13 March 20th, 2002 through August 8th, 2002. And is it
14 fair to say that you reviewed these prior to your
15 interview with Ms. Spoltore?
16   A. Yes.
17   Q. Okay. Now I'd like you to turn to the first
18 one, which is dated March 20th, 2002.
19   A. Okay.
20   Q. Okay, and at the bottom of the narrative in the
21 first, in the first section, it appears to read "son
22 is a drug addict" and it has perhaps using, the word
23 is "using cocaine"? Do you see that?
24   A. I believe that's what they're trying to say.

Case 1:04-cv-00125-JJF-MPT    Document 79-3    Filed 03/08/2005    Page 5 of 7

| Spoltore | v. | Wilmiington Professional |
|---|---|---|
| Neil S. Kaye, M.D. | C.A. # 04-125 JJF | January 20, 2005 |

### Page 38

1  Q. Okay. Now, did you discuss that with Miss
2  Spoltore?
3  A. Yes.
4  Q. Okay. What did she tell you?
5      MS. SUTTON: I'm just going to object.
6  There might be HPPA issues related to the son. As
7  long as we agree that this portion of the transcript
8  would be deemed confidential.
9      MR. CRONIN: I'm more than glad to treat
10 any portion of the transcript as confidential for
11 present purposes, subject to our ability to raise it
12 at a later time if we believe we need to at trial.
13     MS. SUTTON: Well I'm just saying, he
14 hasn't -- this involves his medical condition.
15     MR. CRONIN: That's fine.
16 A. This doctor made a note about that, and the
17 reason I believe --
18 Q. I'm sorry, I didn't catch the first part.
19 A. The doctor made a note about this, and the
20 reason I believe is related to the decision on the
21 medications that Dr. Jackovic was going to be
22 prescribing to Miss Spoltore, one of which is a
23 potentially addicting drug and it's fairly common when
24 we're going to do that to want to be cautious. And so

### Page 39

1  I think it wasn't that this was a stressor
2  particularly to Ms. Spoltore, that wasn't why she came
3  in to see Dr. Jackovic. But Dr. Jackovic wants to
4  know that and remind herself of that, so that in
5  picking medications or medications that might be
6  available in the household, it's going to be safer for
7  everybody.
8  Q. Do you know how old her son is?
9  A. She has three children, if my memory is right,
10 and they're adult. They're all adults. I want to say
11 between 30 and 40 years of age.
12 Q. Does he live in the house?
13 A. I don't know the answer to that question.
14 Q. Okay. Did you ever discuss Miss Spoltore with
15 Dr. Jackovic?
16 A. No.
17 Q. Now, when you asked Miss Spoltore about her son
18 and this note, what did she tell you?
19 A. She acknowledged that, like any good mother,
20 she worries about her children. And moms and even
21 dads are supposed to do that. But that that wasn't
22 why she went to see her doctor. She went to see her
23 doctor because of all of the sentences that come
24 before that, which have to do with lost her job,

### Page 40

1  fired, accused of adding codes, and that she herself
2  is symptomatic and looking for help. That's why
3  people go to their doctors.
4  Q. Okay. Did she tell you when you talked about
5  her son in October of 2004 when it was that she first
6  understood that her son was a drug addict?
7      MS. SUTTON: Objection to the form.
8  A. I don't think I ever asked her when she thought
9  her son became a drug addict.
10 Q. Okay. Did you consider that as a possible
11 stressor for Miss Spoltore?
12 A. Again, I think referring to my earlier
13 testimony, I considered everything as a possible
14 stressor. But I did not feel that that was a
15 significant stressor. I didn't think it was the
16 reason that she was getting care or treatment.
17 Q. Okay, did you also ask her about the note in
18 here that says that she thought she was terminated as
19 a result of a personality conflict?
20 A. Yes.
21 Q. Okay, what did she tell you about that?
22 A. Well, she told me that she thought she was
23 being fired for a variety of reasons, one of which was
24 that she didn't get along with some other people

### Page 41

1  there. She thought that might also be that since she
2  got fired the day after she complained about problems
3  in a closed-door meeting, that maybe it was
4  complaining that was part of what led to her being
5  fired. That didn't make a lot of sense to her, but
6  simple human cause and effect. I say something, I get
7  fired the next day, leads one to believe that there
8  might be a relationship since temporally they occur so
9  closely.
10     She told me that they told her that she
11 was being fired for illegal coding violations, and she
12 thought that that was absolutely false, that that was
13 essentially some made-up reason or excuse to get rid
14 of her, but that it really wasn't legitimate because
15 she'd been doing her job the same way for a long
16 period of time, and others in the company were doing
17 the exact same thing and they didn't get fired and she
18 did. She thought age might be a factor. She thought
19 it might be a factor that she was earning more money
20 than other people. Having been there a longer period
21 of time, she had seniority. She told me she thought
22 it might be because she was due to be fully vested in
23 the company in a short period of time, and that they
24 got rid of her now, it would save them money.

Case 1:04-cv-00125-JJF-MPT   Document 79-3   Filed 03/08/2005   Page 6 of 7

| Spoltore | v. | Wilmiington Professional |
|---|---|---|
| Neil S. Kaye, M.D. | C.A. # 04-125 JJF | January 20, 2005 |

**Page 42**

1  Q. Okay. Is it fair to say that in reviewing all
2  of this with Ms. Spoltore, you've not reviewed any
3  documents which provide the company's side of why they
4  terminated Ms. Spoltore?
5  A. I don't think that's correct. I think that the
6  investigative reports that I have testified that I've
7  read clearly show the employer's position, what they
8  felt. And that in the process, people like EEOC and
9  the Division of Labor clearly set out in their rulings
10 this is what the employer's position was and believed
11 and felt and is alleging, and then at the end in the
12 decision they say we don't believe it. We believe
13 Miss Spoltore, and we don't think that she did wrong.
14 Essentially I've gotten the chance to see both sides
15 of it, and one would think that the people
16 representing the employer put their best case forward
17 in front of those triers of fact.
18 Q. Okay. But the only thing that you know about
19 the company's actions towards Miss Spoltore is what
20 she's told you and from the documents that you've
21 reviewed and what Ms. Sutton has told you, correct?
22     MS. SUTTON: Objection to the form.
23 A. I mean I testified my opinions are based on,
24 yes, all the documents I've reviewed and interviewing

**Page 43**

1  Miss Spoltore, so anything I have I've looked at.
2  Q. Returning to your report, and again the
3  sentence, the last sentence of the last full paragraph
4  where you state, "I do not believe that subsequent
5  mental health issues that appear in the record are
6  related to the job termination." What time frame are
7  those subsequent mental health issues that you're
8  referring to in your letter?
9  A. 2004, as I remember.
10 Q. Okay. And was 2004 the only time that you
11 believe she ever suffered from these mental health
12 issues?
13     MS. SUTTON: Objection to the form.
14 A. I mean that's when she -- I would say that
15 that's when they became significant enough to appear
16 in the records.
17 Q. Did she have any prior history with any of the
18 medical health issues that you're referring to in your
19 report, prior to 2004?
20     MS. SUTTON: And I object to the form.
21 Are you talking about the issues that are being
22 raised, the issues that aren't relevant to this?
23 Q. That you have stated are not relevant to the
24 case. What I'm referring to in your language, the

**Page 44**

1  mental health issues, since nobody will identify the
2  mental health issues on the record, what I'm asking
3  you is prior to 2004, did Ms. Spoltore suffer from any
4  of these mental health issues?
5     MS. SUTTON: And I'm objecting to the
6  form. I'm objecting because you're going back long
7  before, long before the termination during the period
8  of time that's not relevant.
9     MR. CRONIN: Yes. Well, see, we disagree
10 with respect to what's relevant and what isn't
11 relevant. Certainly if she has a preexisting
12 condition, that would impact her alleged injuries that
13 have now been described as occurring between March 6th
14 and May 8th, 2002. We have the right to figure out
15 what those preexisting conditions are.
16 Q. And my question is very simple. Your letter
17 refers to undisclosed mental health issues that you've
18 testified shows up in the record in 2004. Is there
19 any indication that any of those mental health issues
20 existed prior to 2004?
21 A. I don't think I can answer that question.
22 Q. Why can't you answer that question?
23 A. I think it may take me into areas that are
24 privileged.

**Page 45**

1  Q. Okay. Well, we'll get back to this.
2     One of the medical health issues that
3  you're referring to in the letter is depression,
4  correct?
5     MS. SUTTON: I'm going to object, because
6  it's not relevant. Well, go ahead. You can ask him
7  about depression.
8  Q. I mean that is one of the mental health issues
9  that you're referring to in your letter, it's
10 depression, correct?
11 A. You're talking in the second paragraph that
12 between March 6th and May 9th I am referring to
13 depression.
14 Q. No, no, no. I'm referring to your letter, Kaye
15 No. 2 --
16 A. Right.
17 Q. -- in which you state, "I do not believe that
18 subsequent mental health issues that appear in the
19 record are related to the job termination." Okay?
20 And you're referring to undisclosed mental health
21 issues that appear in the record from 2004, correct?
22 A. Right, I said I'm not going to testify about
23 those.
24 Q. Okay. But my question is one of those is

Case 1:04-cv-00125-JJF-MPT    Document 79-3    Filed 03/08/2005    Page 7 of 7

| Spoltore | v. | Wilmiington Professional |
|---|---|---|
| Neil S. Kaye, M.D. | C.A. # 04-125 JJF | January 20, 2005 |

**Page 46**

1 depression, isn't it?
2   A. And I said I'm not going to answer that
3 question.
4       MS. SUTTON: Yeah, I think these are
5 privileged. I mean we've already established she had
6 none of these around the time of her job termination,
7 and for years prior. And our position is the issues
8 that arose in 2004 are privileged. They're not
9 relevant and we're not going to -- I'm going to
10 instruct him not to answer anything relating to it.
11      MR. CRONIN: Okay.
12  Q. Turn back to Kaye No. 1. I'd like you to turn
13 to the last page of that document. Do you see the
14 entry for July 20th, 2004?
15  A. Yes, I do.
16  Q. Okay. Is it your opinion that this depression
17 is not related to the depression she allegedly
18 suffered as a result of the termination from March 6,
19 2002 until May 9, 2002?
20      MS. SUTTON: I'm objecting to the form of
21 that question. It says that's what she's complaining
22 of --
23      MR. CRONIN: Right.
24      MS. SUTTON: -- not that it was a

**Page 47**

1 diagnosis at that time.
2       MR. CRONIN: Okay.
3   A. Ms. Sutton said exactly what I was going to
4 say, is that this is from Dr. Jackovic and
5 Dr. Jackovic is noting that Miss Spoltore is
6 complaining of depression and throat pain. Those are
7 both symptoms, neither of which are diagnoses, and
8 there's nothing here that says that Dr. Jackovic
9 reached any diagnosis or made any intervention from
10 this.
11  Q. Is it your understanding that she was
12 subsequently diagnosed with depression after
13 complaining about it on July 20th, 2004?
14      MS. SUTTON: And I'm going to instruct him
15 not to answer questions that relate to a condition
16 that arose in 2004 that was not present in, at or
17 around the time of the termination.
18  Q. For what purpose is Wellbutrin prescribed?
19  A. Wellbutrin is prescribed for a variety of
20 things. It is FDA approved for depression, it is FDA
21 approved for smoking cessation. And then of course
22 like most medications, it's used off-label by doctors
23 for lots of different other things.
24  Q. For what purpose is Zyprexa prescribed?

**Page 48**

1   A. There's over 300 different uses for Zyprexa in
2 the medical literature at the current time, having
3 recently reviewed that. Zyprexa is FDA approved for
4 schizophrenia, bipolar disorder, and is generally
5 classified as an antipsychotic. But again, as I said,
6 there is at least 300 different uses for it in our
7 literature, so we use it for all sorts of things.
8       MR. CRONIN: Okay. All right, based on
9 the state of the record and based on what you're
10 willing to answer and what you're not willing to
11 answer, I have no further questions at this time. I
12 do expect that we will revisit this at some time
13 hopefully in the near future. But I appreciate your
14 cooperation.
15      (The deposition concluded at 10:31 a.m.)
16          I N D E X
17        E X H I B I T S
18 Kaye:                                Page
19  1   Letter to Dr. Kaye with attachments    6
20  2   10/19/04 Letter                10
21  3   Health Care Center at Christiana    37
        Records
22
23          - - - - -
24

**Page 49**

Replace this page
with the Errata Sheet
after it has been
completed and signed
by the Deponent