**DEFENDANT'S SECOND MOTION TO COMPEL**                    **EXHIBIT B**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

ANDREA L. SPOLTORE,                )
f/k/a ANDREA L. CADWALLADER,       )
                                   )
            Plaintiff,             )
                                   )  C.A. No. 04-125 (JJF)
v.                                 )
                                   )  Confidential pages 35-36
WILMINGTON PROFESSIONAL            )  Filed Under Seal
ASSOCIATES, INC.,                  )
                                   )
            Defendant.             )

Deposition of ELIZABETH A. JACKOVIC, D.O. taken pursuant to notice at the offices of Dr. Jackovic, 200 Hygeia Drive, Newark, Delaware, beginning at 11:06 a.m., on Tuesday, January 25, 2005, before Patricia L. Shelton, Registered Professional Reporter and Notary Public.

APPEARANCES:

    KIMBERLY D. SUTTON, ESQ.
    OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
      20 Brace Road - Suite 300
      Cherry Hill, New Jersey  08034
      for the Plaintiff

    LAURENCE V. CRONIN, ESQ.
    SMITH KATZENSTEIN & FURLOW, LLP
      800 Delaware Avenue
      Wilmington, Delaware  19899
      for the Defendant

ALSO PRESENT:

    ANDREA L. SPOLTORE
    ANGELA DeMAIO

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Spoltore                                                    v.                                    Wilmington Professional Associates, Inc.
Elizabeth A. Jackovic, D.O.                    C.A. No. 04-125 (JJF)                                January 25, 2005

Page 6

1  Okay?
2  A. Okay.
3  Q. As has been explained to you, I represent the
4  defendant, Wilmington Professional Associates, which
5  formerly employed the plaintiff, Ms. Spoltore.
6  Ms. Spoltore has sued Wilmington Professional Associates
7  making various claims as to the nature of her
8  termination. In connection with that litigation, she is
9  making certain claims regarding injuries she has
10 suffered, particularly emotional injuries.
11     And we're here today for me to ask you
12 questions about what we understand will be your testimony
13 at trial in support of Ms. Spoltore's claims for
14 emotional injury, as well as in relation to her neck
15 condition that necessitated some treatment.
16     Do you understand that?
17 A. Yes.
18 Q. Okay. When did you first come to understand that
19 you would be testifying on Ms. Spoltore's behalf at
20 trial?
21 A. Last week.
22 Q. How did you find that out?
23 A. The gentleman who set up the deposition came over
24 and let me know that the deposition was set up.

Page 7

1  Q. What gentleman was that?
2  A. He does the scheduling for this -- for the
3  physicians.
4  Q. Prior to that, did anybody tell you that you had
5  been identified as a witness who would testify on behalf
6  of Ms. Spoltore at the trial in this case?
7  A. No.
8  Q. Do you understand what a trial is?
9  A. Yes.
10 Q. Have you spoken with Ms. Sutton before about this
11 case?
12 A. No.
13 Q. At some point in time, were you asked to give a
14 report in connection with Ms. Spoltore?
15 A. Yes.
16 Q. Who asked you to do a report?
17 A. Kimberly D. Sutton.
18 Q. And did she send you a letter?
19 A. Yes.
20 Q. Could I see that letter, please?
21     MR. CRONIN: No objection?
22     MS. SUTTON: I have a copy of it.
23     I think I gave it to you with the medical
24 records I gave --

Page 8

1      MR. CRONIN: I have the one in which you
2  requested records from her. I don't have a copy of
3  this (indicating), though.
4      MS. SUTTON: I didn't give that to you with
5  the redacted copies?
6      MR. CRONIN: No. You gave me...
7      Would you mind faxing it?
8      MS. SUTTON: No. That's fine.
9      MR. CRONIN: Great.
10 BY MR. CRONIN:
11 Q. Now, did you have any discussion with Ms. Sutton
12 before you got that letter?
13 A. No.
14 Q. Did you have any discussion with her after you
15 got the letter?
16 A. No.
17 Q. But then you went ahead and did a report; is that
18 correct?
19 A. Yes.
20     (Jackovic Deposition Exhibit No. 1 was
21 marked for identification.)
22 BY MR. CRONIN:
23 Q. Dr. Jackovic, I'm going to hand you what's been
24 marked as Jackovic No. 1. And, please, take as much time

Page 9

1  as you like to read through the document.
2      Dr. Jackovic, I noticed you were comparing
3  it to another document. Is that another copy of the
4  letter that is in your file?
5  A. Yes.
6  Q. Is that letter also redacted?
7  A. Yes.
8  Q. Is it redacted the same or is it redacted
9  differently?
10 A. Differently.
11     MR. CRONIN: Could I see that one?
12     MS. SUTTON: You have -- can I see what it
13 is first?
14     MR. CRONIN: Sure.
15     MS. SUTTON: Yeah, you can see that one. I
16 have no problem with that.
17     MR. CRONIN: Is this the same one Dr. Kaye
18 had?
19     MS. SUTTON: Yeah, the same one from
20 Dr. Kaye it looks like.
21 BY MR. CRONIN:
22 Q. Now, Dr. Jackovic, do you have an unredacted form
23 of that letter?
24 A. Yes.

Case 1:04-cv-00125-JJF-MPT   Document 79-4   Filed 03/08/2005   Page 4 of 11

| Spoltore | v. | Wilmington Professional Associates, Inc. |
| --- | --- | --- |
| Elizabeth A. Jackovic, D.O. | C.A. No. 04-125 (JJF) | January 25, 2005 |

Page 10

1  Q. And as I'm sure you understand, there have been
2  contentions raised by both parties about whether or not
3  we should be entitled to see the unredacted portions of
4  that, and they're being handled separately by the court.
5  So I'm not going to ask you to say anything for whatever
6  reason you feel you cannot say it. But I do need to make
7  a record for purposes of what you're willing to testify
8  about.
9      Are you willing to testify today about the
10 portions of the letter that are redacted?
11     Let me ask it another way. Are you willing
12 to show me the unredacted letter?
13 A. It is my understanding based on HIPPA regulations
14 that I am only allowed to divulge information which has
15 been permitted.
16 Q. And who gave you that understanding?
17 A. HIPPA.
18 Q. From your own independent research of HIPPA?
19     MS. SUTTON: Objection to form.
20 BY MR. CRONIN:
21 Q. I'm trying to get an understanding of whether
22 somebody advised you to say that or not.
23     Who redacted the document?
24 A. Kimberly D. Sutton.

Page 11

1  Q. Did Ms. Sutton explain to you the purpose of the
2  redactions?
3  A. Yes.
4  Q. Just through the note on the fax cover sheet of
5  January 24th?
6  A. Yes.
7  Q. Have you had any other discussion with Ms. Sutton
8  regarding redactions to that report?
9  A. No.
10 Q. Have you had any discussions with anyone else
11 regarding the appropriateness of the redactions to that
12 report?
13     MS. SUTTON: Objection to the form.
14 Q. Did you understand my question?
15 A. Please repeat the question.
16 Q. Sure.
17     I'm trying to get an understanding of
18 whether or not you sought any independent counsel with
19 respect to the appropriateness of those redactions to the
20 report.
21 A. No counsel.
22 Q. Did you do any independent research?
23 A. Yes.
24 Q. What did you do?

Page 12

1  A. I spoke to our risk management department.
2  Q. When did you talk to your risk management
3  department?
4  A. Yesterday.
5  Q. What did they tell you?
6  A. To clarify what was allowed to be discussed; that
7  both attorneys had to agree upon what would be permitted.
8  Q. Now, after you did the report -- and you sent it
9  to Ms. Sutton; is that correct?
10 A. Yes.
11 Q. And was that around October 7th, 2004?
12 A. Yes.
13 Q. Did you send it with any kind of a cover letter
14 or any other communication?
15 A. No.
16 Q. Did you call her and tell her it was coming?
17 A. No.
18 Q. So you just did the report and you sent it out;
19 is that correct?
20 A. I did the report and I gave it to our medical
21 records department.
22 Q. Then they sent it out?
23 A. Yes.
24 Q. And do they just send it out with a letter or did

Page 13

1  it go with something else?
2  A. I don't know.
3  Q. Now, did you at some point in time hear back from
4  Ms. Sutton regarding the report?
5  A. No.
6  Q. What did you do prior to writing this report?
7      MS. SUTTON: Objection to the form.
8      With respect to this case?
9  BY MR. CRONIN:
10 Q. Well, you got the request for a report based on
11 the letter that Ms. Sutton sent, correct?
12 A. Yes.
13 Q. And so what I'm asking you is what did you do for
14 purposes of putting this report together after you
15 received Ms. Sutton's letter?
16 A. I reviewed Ms. Spoltore's chart and formulated my
17 opinion.
18 Q. All right. Let's turn to the report, which has
19 been marked as Jackovic No. 1.
20     Now, looking at the first page of the report
21 and going on to the first line of the second page, is it
22 fair to say that each of these entries relate to problems
23 that Ms. Spoltore was experiencing with her neck?
24 A. Yes.

Case 1:04-cv-00125-JJF-MPT   Document 79-4   Filed 03/08/2005   Page 5 of 11

| Spoltore | v. | Wilmington Professional Associates, Inc. |
| --- | --- | --- |
| Elizabeth A. Jackovic, D.O. | C.A. No. 04-125 (JJF) | January 25, 2005 |

Page 14

1  Q. How long have you treated Ms. Spoltore regarding
2  her neck condition?
3  A. Since October 5th, 2001.
4  Q. And are you continuing to treat her for her neck
5  condition?
6  A. Yes.
7  Q. How often do you see her currently with respect
8  to her neck condition?
9  A. She has been referred to a specialist and I
10 receive copies from the specialist.
11 Q. When was she referred to a specialist in
12 connection with her neck condition?
13     MS. SUTTON: The first time?
14 BY MR. CRONIN:
15 Q. Well, let's start with the first time. When did
16 you first refer her to a specialist?
17 A. On January 31st, 2002.
18 Q. And who did you refer her to?
19 A. Dr. Koyfman.
20 Q. Subsequent to your referral to -- referring her
21 to Dr. Koyfman on January 31st, 2002, did you provide any
22 additional treatment to Ms. Spoltore in connection with
23 her neck condition other than receiving reports?
24     MS. SUTTON: Objection to the form.

Page 15

1  A. Repeat the question.
2  Q. Yeah. I'm trying to get a sense of after you
3  referred Ms. Spoltore to a specialist, Dr. Koyfman, on
4  January 31st, 2002, did you provide any further treatment
5  to Ms. Spoltore in connection with her neck condition?
6  A. I'm unable to answer that question.
7  Q. Why?
8  A. The note that discusses it is privileged.
9  Q. Can you tell me what is contained in the note,
10 without showing me the note, that refers to treatment
11 that you provided to Ms. Spoltore in connection with her
12 neck?
13     MS. SUTTON: I have no objection to
14 testifying to the neck.
15 BY MR. CRONIN:
16 Q. What date are we dealing with?
17 A. May 20th, 2004.
18 Q. Would it be fair to say, then, that you did not
19 provide any treatment for Ms. Spoltore's neck condition
20 from when you referred her to a specialist on
21 January 31st, 2002 until May 20th, 2004?
22 A. I recommended that she contact Dr. Koyfman for a
23 concern --
24 Q. Okay.

Page 16

1  A. -- in the interim.
2  Q. So then again on May 20th, 2004, she raised with
3  you at that time a problem she was having with her neck?
4  A. Yes.
5  Q. And what did you do?
6  A. I ordered an X-ray and advised range of motion
7  exercises.
8  Q. After the encounter on May 20th, 2004, did you
9  provide any other treatment to Ms. Spoltore regarding her
10 neck condition?
11 A. Yes.
12 Q. And when was that?
13 A. June 24th, 2004.
14 Q. And what sort of treatment did you provide on
15 June 24th, 2004 in connection with Ms. Spoltore's neck
16 condition?
17 A. She was having shoulder pain, right shoulder
18 pain.
19 Q. What treatment --
20 A. And she was advised to see a specialist.
21 Q. Was that the last time that you provided
22 treatment to Ms. Spoltore with respect to her neck
23 condition?
24 A. No.

Page 17

1  Q. When was the next time you treated her with
2  respect to her neck condition?
3  A. On September 3rd of 2004, there was a
4  conversation in regards to setting up a consultation with
5  a neurosurgeon.
6  Q. Any other occasions in which you provided
7  treatment to Ms. Spoltore regarding her neck condition?
8  A. No.
9  Q. During the period of time that you did provide
10 treatment to Ms. Spoltore regarding her neck condition,
11 did you form an opinion as to the nature of that
12 condition?
13 A. Yes.
14 Q. What is your opinion with respect to the nature
15 of her neck condition?
16 A. That she was having radicular symptoms involving
17 her right arm.
18 Q. When did you --
19 A. And this warranted an MRI.
20 Q. When did you form that opinion?
21 A. 1/22/02.
22 Q. Now, the neck condition for which you treated
23 Ms. Spoltore in 2004, is that the same condition or is it
24 a different neck condition?

Case 1:04-cv-00125-JJF-MPT   Document 79-4   Filed 03/08/2005   Page 6 of 11

| Spoltore | v. | Wilmington Professional Associates, Inc. |
|---|---|---|
| Elizabeth A. Jackovic, D.O. | C.A. No. 04-125 (JJF) | January 25, 2005 |

Page 18

1  MS. SUTTON: Objection to the form.
2  BY MR. CRONIN:
3  Q. Let me withdraw that question and ask another
4  one.
5      The symptoms you described from
6  January 22nd, 2002, did you get an understanding at some
7  point for what the cause was for those symptoms?
8  A. Yes.
9  Q. And what did you understand?
10 A. Degenerative changes in her neck.
11 Q. And how did you get that understanding?
12 A. Ms. Spoltore had an MRI.
13 Q. And you were informed of the results of the MRI?
14 A. Yes.
15 Q. What did the MRI reveal?
16 A. There were multiple disc herniations causing
17 impingement and spinal stenosis.
18 Q. And this is from the MRI report of January 31st,
19 2002?
20 A. Yes.
21 Q. Now, in 2004 when Ms. Spoltore sought and
22 received treatment from you with respect to her neck
23 condition, do you know whether the symptoms she was
24 experiencing then were the result of the same disc

Page 19

1  herniations or whether a new problem had developed in her
2  neck?
3  A. It was my feeling it was the same problem.
4  Q. What was that feeling based on?
5  A. Her location of pain.
6  Q. Now, during the time that you have treated
7  Ms. Spoltore, was it your opinion that Ms. Spoltore was
8  prevented from doing anything as a result of her neck
9  condition?
10 A. Please repeat the question.
11 Q. Sure.
12    Let me try to explain what I'm looking for
13 here. Did she have any restrictions, any medical
14 restrictions placed upon her as a result of having this
15 neck condition, either something she could not do --
16 A. Yes.
17 Q. -- or something she should not do?
18 A. Yes.
19 Q. Let's start with the things that she could not
20 do. During the time that you've treated her -- and you
21 started treating her, I guess it was in March 2001?
22    MS. SUTTON: Objection to the form.
23 A. October 5th of 2001 for this problem.
24 Q. With respect to the neck. Okay. I'll accept

Page 20

1  that date.
2      From October 2001 to the present, what
3  things, in your opinion, could Ms. Spoltore not do
4  because of her neck condition?
5  A. She, prior to October 25th of 2001, was not able
6  to perform full duties at work.
7  Q. But then she was released to return to work with
8  no limitations in October 2001, correct?
9  A. Yes.
10 Q. After she was returned to work with no
11 restrictions in October 2001, subsequent to that, was
12 there any point in time where there was something that
13 Ms. Spoltore could not do as a result of her neck
14 condition?
15 A. Yes.
16 Q. What could she not do as a result of her neck
17 condition subsequent to being released to work full time
18 in October 2001?
19 A. She was given a note from one of my partners that
20 she was not able to perform all her duties.
21 Q. Which of your partners? This is Dr. Hamming?
22 A. Yes.
23 Q. And when was Dr. Hamming's note?
24 A. 9/25 of '01.

Page 21

1  Q. Okay. I'm dealing with the period subsequent to
2  her return to work. You released her to return to work
3  full time the following month, right, October 2001?
4  A. Mm-hmm.
5  Q. And what I'm asking you is subsequent to that,
6  are you aware of anything that Ms. Spoltore could not do
7  as a result of her neck condition?
8  A. No.
9  Q. Now, subsequent to when you released her to
10 return to work full time in October of 2001, are you
11 aware of any limitations that were imposed upon her
12 activities by any physician or healthcare provider
13 providing treatment to Ms. Spoltore?
14 A. No.
15 Q. To your knowledge, since she was returned to work
16 full time with no restrictions in October 2001, how much
17 time has Ms. Spoltore missed from work because of her
18 neck condition?
19 A. I don't know.
20 Q. Now, turning back to what's been marked as
21 Jackovic No. 1, your letter of October 7th, 2004, the
22 remainder of the letter appears to deal with the
23 treatment she received from you relating to emotional
24 distress; is that correct?

Case 1:04-cv-00125-JJF-MPT   Document 79-4   Filed 03/08/2005   Page 7 of 11

| Spoltore | | |
|---|---|---|
| Elizabeth A. Jackovic, D.O. | v.<br>C.A. No. 04-125 (JJF) | Wilmington Professional Associates, Inc.<br>January 25, 2005 |

Page 22

1  A. Yes.
2  Q. Now, is it fair to say that the information that
3  has been redacted from the letter also relates to
4  emotional distress?
5  A. It is my understanding I cannot answer that
6  question.
7  Q. Why did you include the redacted information in
8  your letter?
9  A. I was asked to formulate my opinion, and I
10 reviewed the medical record in its entirety.
11 Q. How long did you treat Ms. Spoltore for emotional
12 distress? And if there were two different periods, tell
13 me what those periods are. Or, if you can't tell me what
14 one of the periods are, tell me that.
15 A. March 20th, 2002 to August 8th, 2002.
16 Q. Was there another period where you provided
17 treatment regarding emotional distress or -- go ahead.
18 A. I'm not able to answer that question.
19 Q. Now, with respect to the period that you can
20 testify about, did you reach a diagnosis of the condition
21 that you believe Ms. Spoltore suffered from?
22 A. Yes.
23 Q. And what was that diagnosis?
24 A. Situational anxiety/depression.

Page 23

1  Q. Is there a DSM-IV category that relates to
2  situational anxiety/depression?
3  A. I do not know.
4  Q. What are the clinical criteria for situational
5  anxiety/depression?
6  A. The criteria that I follow is that there is a
7  reasonable understanding that a certain situation has led
8  to a mental condition.
9  Q. How does situational anxiety differ from other
10 types of anxiety?
11 A. There was a cause -- there was a cause -- a
12 situation that caused it. There was an occurrence that
13 caused it.
14 Q. Are you aware of any literature that you rely on
15 for the diagnosis of situational anxiety/depression?
16 A. My understanding is through my training.
17 Q. How long did Ms. Spoltore suffer from what you've
18 described as situational anxiety/depression?
19 A. March 20th of 2002 to August 8th, 2002.
20 Q. What was your basis for concluding that the
21 situational anxiety/depression lasted for that period of
22 time?
23 A. She was seen April 5th of 2002, was feeling a bit
24 better, but having some difficulty interviewing. And on

Page 24

1  April 19th of 2002, she was seen and still feeling
2  anxious and was prescribed medication. I continued to
3  follow her. On August 8th, 2002, she appeared stable on
4  her medication and was, in her words, doing great.
5  Q. So based on that, it was your opinion that her
6  situational anxiety/depression had ended on that date?
7  A. It was my understanding that it was being treated
8  so that it was stable.
9  Q. But you used certain criteria for purposes of
10 giving her this diagnosis, correct?
11 A. Mm-hmm. Yes.
12 Q. And was it your understanding that she still
13 suffered from the condition?
14 A. Yes.
15 Q. Recognizing that she was receiving appropriate
16 treatment, how long a period of time did she continue to
17 suffer from situational anxiety/depression?
18 A. She was feeling -- doing great, in her words, on
19 August 8th of 2002 while she was on medication.
20 Q. How long did she stay on medication?
21 A. It is part of the information I am not able to
22 discuss.
23      (Jackovic Deposition Exhibit No. 2 was
24 marked for identification.)

Page 25

1  BY MR. CRONIN:
2  Q. So as of August 8th, 2002, Ms. Spoltore was
3  continuing to receive medication for her situational
4  anxiety and depression and that this medication continued
5  after that date and continued into the period where
6  you're telling me you can't talk about it; is that
7  correct?
8  A. Correct.
9  Q. Okay. I'm going to hand you what's been marked
10 as Jackovic No. 2, which I'll represent to you I believe
11 are copies of the documents that you were just
12 referencing, specifically the encounter forms that you
13 were filling out from March 20th to August 8th, 2002.
14      MS. SUTTON: Just for purposes of the
15 record, she's allowed to answer the last question. I
16 think Ms. Spoltore has already testified about that at
17 her deposition.
18      MR. CRONIN: Oh, okay. You're going...
19      MS. SUTTON: Yeah. She can testify about
20 how long she was on the medication.
21      Yeah, that was already testified to.
22      THE WITNESS: She is currently on
23 medication.
24

Page 26

1  BY MR. CRONIN:
2    Q. On the same medication that was prescribed to her
3  to treat her situational anxiety and depression?
4    A. No.
5    Q. When did the medication change?
6    A. There were several changes.
7         MR. CRONIN: Okay. Let's go off the record
8  a second.
9         (Discussion was held off the record.)
10 BY MR. CRONIN:
11   Q. Why don't you tell me about the change in the
12 medications from the very beginning that you prescribed
13 for Ms. Spoltore to treat her situational
14 anxiety/depression?
15   A. I prescribed medication and other providers
16 became involved in her care and medications were changed.
17   Q. Well, let's start at the beginning. What did you
18 prescribe initially?
19   A. On 3/20 of 2002, I prescribed Xanax and Zoloft.
20   Q. Okay. Why don't you just -- I can keep asking
21 you questions or, if you like, you can take me through
22 the history which prescriptions changed.
23   A. April 5th of '02, I prescribed Xanax and Zoloft.
24 On April 19th of 2002, I stopped the Zoloft and

Page 27

1  prescribed Paxil.
2    Q. Why did you make that change?
3    A. She discussed social anxiety disorder symptoms.
4  And I felt Paxil may help her better.
5    Q. Better than the Zoloft?
6    A. Yes.
7    Q. You prescribed the Zoloft for her depression?
8    A. Yes.
9    Q. Now, when you discussed the social anxiety
10 symptoms with Ms. Spoltore, did you diagnose Ms. Spoltore
11 as suffering from social anxiety disorder?
12   A. Yes.
13   Q. Now, is it your opinion that the social anxiety
14 disorder was caused by Ms. Spoltore's termination?
15   A. No.
16   Q. Was it your opinion that Ms. Spoltore suffered
17 from social anxiety disorder prior to her termination?
18   A. Yes.
19   Q. Did you reach a conclusion as to when
20 Ms. Spoltore began to suffer from social anxiety
21 disorder?
22   A. She described difficulty standing up in front of
23 people while at school, while she had been at school.
24   Q. So from that, did you reach a conclusion as to

Page 28

1  likely how long it had been that Ms. Spoltore had
2  suffered from social anxiety disorder?
3    A. Repeat the question.
4    Q. I'm just trying to get a sense as to what
5  conclusions you reached, if any, with respect to how long
6  Ms. Spoltore had suffered from social anxiety disorder.
7    A. She had had it chronically during school time and
8  different work functions that she would have to do. So
9  it was a problem that was -- that came to light when --
10 after her termination when she was going for interviews
11 she brought this up.
12   Q. So in April of '02, you changed her prescription
13 to Xanax and Paxil. What was the next change that you
14 made with respect to her prescriptions?
15   A. On January 7th of 2003, I changed her to Paxil CR
16 25 milligrams.
17   Q. Why did you make that change?
18   A. The CR's are better tolerated, better release
19 system.
20   Q. When did Ms. Spoltore stop taking Xanax, or did
21 you continue to prescribe Xanax?
22   A. Xanax was always prescribed as a PRN, meaning
23 as-needed, for certain symptoms. And it is a medication
24 that she was advised to only take if needed and to avoid

Page 29

1  taking it.
2    Q. How often did you prescribe Xanax subsequent to
3  when she first came to see you on March 20th, 2002 with
4  respect to her termination?
5    A. She hadn't required any refills since 4/19/2002
6  on her Xanax.
7    Q. What about the Paxil? After you changed the
8  prescription in January '03, what was the next change to
9  any of her medications with respect to emotional
10 distress?
11   A. It is my understanding I cannot discuss that
12 information in her record.
13        MS. SUTTON: She can testify as to the --
14 just the date the medication was changed.
15        THE WITNESS: She was seen by another
16 physician and made changes.
17 BY MR. CRONIN:
18   Q. When was that?
19   A. Repeat the question.
20   Q. When was that?
21   A. When?
22   Q. Yes.
23        What you testified was she saw another
24 physician who made changes.

Case 1:04-cv-00125-JJF-MPT   Document 79-4   Filed 03/08/2005   Page 9 of 11

| Spoltore | v. | Wilmington Professional Associates, Inc. |
| --- | --- | --- |
| Elizabeth A. Jackovic, D.O. | C.A. No. 04-125 (JJF) | January 25, 2005 |

Page 30

1  A. Yes.
2  Q. I assume by "changes," changes to the Paxil that
3  you prescribed, correct?
4  A. Yes.
5  Q. Okay. When was that?
6  A. She reported that the changes had been made to me
7  on July 27th of '04.
8  Q. What was the change in medication?
9  A. She was put on Remeron. She was still on Paxil.
10 And had been given a prescription for Trazodone.
11 Q. What was the Remeron for?
12    MS. SUTTON: What's its purposes?
13    MR. CRONIN: Right.
14    MS. SUTTON: In general?
15    MR. CRONIN: What was the purpose in this
16 instance?
17    MS. SUTTON: I'm concerned you're going to
18 get into privileged information.
19    MR. CRONIN: I got to leave it up to you.
20    MS. SUTTON: In general I have no objection.
21    MR. CRONIN: I'm asking the questions. And
22 you have to -- if you don't want her to answer the
23 question, then you need to say so.
24    MS. SUTTON: It's hard for me to value

Page 31

1  because I don't have the records.
2     Which one is this? July '04?
3     THE WITNESS: July 27 of 2004.
4     MS. SUTTON: Just the reason why she was
5  on --
6     MR. CRONIN: Remeron.
7     MS. SUTTON: -- the Remeron?
8     MR. CRONIN: Right.
9     MS. SUTTON: What's the date of the report?
10    MR. CRONIN: July 27, '04.
11    I think you just supplied to me redacted
12 forms of it.
13    MS. SUTTON: Do you have a copy of it?
14    MR. CRONIN: I think I do.
15    MS. SUTTON: I have no objection to you
16 asking her in general what it's used for. But in this
17 specific instance with respect to Ms. Spoltore
18 specifically, I think it's privileged.
19 BY MR. CRONIN:
20 Q. All right. Then we'll go with the question that
21 Ms. Sutton permits. What is Remeron prescribed for?
22 A. Depression.
23 Q. What about Trazodone?
24 A. I generally do not prescribe Trazodone. I leave

Page 32

1  that to specialists.
2  Q. What's your understanding of what Trazodone is
3  prescribed for?
4  A. That it's for anxiety.
5  Q. Does Ms. Spoltore remain on Paxil today?
6  A. I do not know.
7  Q. Did you stop prescribing Paxil to her at some
8  point in time?
9  A. The prescriptions for Paxil have been -- are now
10 managed by another physician.
11 Q. Can you tell me who that physician is?
12 A. Obeidy. Dr. Obeidy.
13 Q. Obeidy. How do you spell that?
14 A. I don't know.
15 Q. Do you know where he's located?
16 A. I don't.
17 Q. Let's turn to what's been marked as Jackovic
18 No. 2. And I'd like to go through briefly some of what
19 appears to be your writing on these documents.
20    First of all, is it your handwriting on the
21 documents?
22 A. Yes.
23 Q. Let's turn to the notation from March 20th, 2002.
24 And specifically you have a lot of handwriting in the

Page 33

1  upper part of the first page. I don't know what you call
2  that block that you filled in. Do you see that?
3     Do you see your handwriting where it says,
4  "Lost job fired"?
5  A. Yes.
6  Q. Then it ends with the words "using cocaine." Do
7  you see that?
8     I'm sure you have a better copy than I do.
9  A. That does not reference my patient.
10 Q. I understand. I'm just trying to get you to
11 focus on this part of the document. What do you call
12 this part of the document?
13 A. That is the subjective.
14 Q. The subjective.
15    Tell me what you recall from your encounter
16 with Ms. Spoltore on March 20th, 2002 that caused you to
17 write what you wrote here in the subjective.
18 A. Okay. Ms. Spoltore was describing her emotional
19 stress that she was going through. And she was letting
20 me know about her family, who -- it was her family that
21 was using cocaine again.
22 Q. How did that come up in the context of this
23 encounter?
24 A. Emotional stress.

Case 1:04-cv-00125-JJF-MPT    Document 79-4    Filed 03/08/2005    Page 10 of 11

| Spoltore | v. | Wilmington Professional Associates, Inc. |
| Elizabeth A. Jackovic, D.O. | C.A. No. 04-125 (JJF) | January 25, 2005 |

**Page 34**

1  Q. Were you asking her questions?
2  A. Yes.
3  Q. And why did Ms. Spoltore, to your knowledge, talk
4  about problems with her family?
5  A. It is part of my patient's well-being, mental
6  well-being to understand what they're going through.
7  Q. What did she tell you with respect to her son?
8     MS. SUTTON: I just -- with respect to this,
9  I'm going to ask that this section be sealed. I think
10 there's HIPPA concerns.
11    MR. CRONIN: That's fine. I have no
12 objection to sealing all of the deposition.
13    THE WITNESS: Repeat the question.
14    (Whereupon, pages 35 and 36 were deemed to
15 be filed under seal pursuant to agreement between the
16 parties.)
17
18           - - - - -

**Page 37**

1  Q. Let's turn to the notes for April 5th, which are
2  the next notes in the collection.
3     What do you recall from that encounter with
4  Ms. Spoltore?
5  A. I understood it that she was able to interview.
6  She was using -- needing medication to help her get
7  through the interviews, but that she was able to -- that
8  that was a good sign, that she was able to begin her
9  interviewing process.
10 Q. Do you remember anything else independent of what
11 you've written in your notes from April 5th, 2002?
12    Do you have any recollection of this
13 encounter with Ms. Spoltore beyond what you've written
14 for April 5th, 2002?
15 A. Yes.
16 Q. What do you recall?
17 A. That she was well groomed. It appeared that she
18 was interviewing.
19 Q. She seemed to be doing better?
20 A. Yes.
21 Q. Let's turn to the notes from April 19th, 2002.
22    Now, what do you recall of this encounter?
23 A. That she was still having quite a bit of anxiety.
24 Q. It was also during this encounter that you

**Page 38**

1  diagnosed her with social anxiety disorder, correct?
2  A. Yes.
3  Q. Could you distinguish the two types of anxiety:
4  The social anxiety disorder from the situational
5  anxiety/depression?
6  A. Social anxiety is the way you function in front
7  of others where people are focused on your activities.
8  And anxiety is -- the way I use it, you know, in
9  evaluating a person, an anxiety is more of either, you
10 know, internal or external type causation. But the
11 social anxiety disorder to me is a focus of when you're
12 in front of people and you have to perform in front of
13 people.
14 Q. Let's turn to the notes from May 9th, 2002.
15    What do you recall of that encounter?
16 A. She appeared to be doing much better. She was
17 working, appeared happy and much more calm and was
18 indicating that she was -- that her medication was
19 helping.
20 Q. But it was your view that she was still suffering
21 from situational anxiety at that time, correct?
22 A. My impressions it was social anxiety disorder,
23 anxiety.
24 Q. Well, you on March 20th, 2002 diagnosed

**Page 39**

1  Ms. Spoltore as suffering from situational
2  anxiety/depression. Was it your opinion as of May 9th,
3  2002 that she still suffered from situational
4  anxiety/depression?
5  A. Yes.
6  Q. And, in fact, in your earlier testimony, you felt
7  she continued to suffer from situational
8  anxiety/depression even after August 8th, 2002, correct?
9  A. It is my understanding that this is a chronic
10 problem that she has.
11 Q. The situational anxiety/depression?
12 A. Yes.
13 Q. What do you mean by "chronic problem"?
14 A. That she will continue to have anxiety and
15 depression.
16 Q. Let's turn back to the letter that I gave you
17 initially, your report of October 7th, 2004. And I'd
18 like you to turn to the very last sentence in that
19 letter.
20    The last sentence reads, "I firmly believe
21 that the emotional distress is in part related to the
22 termination of her employment."
23    Do you see that?
24 A. Yes.

Case 1:04-cv-00125-JJF-MPT    Document 79-4    Filed 03/08/2005    Page 11 of 11

| Spoltore | v. | Wilmington Professional Associates, Inc. |
| --- | --- | --- |
| Elizabeth A. Jackovic, D.O. | C.A. No. 04-125 (JJF) | January 25, 2005 |

Page 40

1  Q. Now, in addition to the termination of her
2  employment, what else is the emotional distress referred
3  to in your letter related to?
4  A. As I understand, I'm not able to answer those
5  questions based on what was redacted from her medical
6  record.
7  Q. Now, you've treated Ms. Spoltore since March of
8  2001, correct?
9  A. Yes.
10 Q. And, to your knowledge, did Ms. Spoltore suffer
11 from any emotional or mental impairment prior to when you
12 treated her, other than what you've testified to with
13 respect to social anxiety disorder?
14 A. Yes.
15 Q. What is the nature of the emotional or mental
16 impairment that Ms. Spoltore suffered from prior to March
17 2002 other than social anxiety disorder?
18 A. I don't know if I can answer that based on the
19 HIPPA regulations and if she would allow me to discuss
20 this information.
21 Q. Okay. Let them confer for a moment.
22     (Jackovic Deposition Exhibit No. 3 was
23 marked for identification.)
24     MS. SUTTON: She can testify. I think it's

Page 41

1  already been discussed by Dr. Kaye.
2      MR. CRONIN: Okay.
3      MS. SUTTON: This is prior to the job
4  termination, correct?
5      MR. CRONIN: Right.
6      THE WITNESS: She had a remote history of
7  alcoholism for which she had been through a program PACE.
8  BY MR. CRONIN:
9  Q. Any other emotional or mental impairments that
10 you're aware of, other than the alcoholism and the social
11 anxiety disorder, prior to her termination in March 2002?
12 A. No.
13 Q. Dr. Jackovic, I'm going to hand you what's been
14 marked as Jackovic No. 3.
15     Do you recognize this document?
16 A. Yes.
17 Q. And what is it?
18 A. This is the first visit that she had to the
19 office.
20 Q. This was March 2nd, 2001?
21 A. March 2nd, 2001 is correct.
22 Q. Now, the part that says "SH," that refers to
23 social history?
24 A. Yes.

Page 42

1  Q. Now, the first note appears to say, I guess,
2  positive for tobacco use, one pack per day; is that
3  correct?
4  A. Yes.
5  Q. And then it says, "Tried Wellbutrin." Was the
6  Wellbutrin in order to treat the tobacco use?
7  A. I asked about Wellbutrin because Wellbutrin is
8  used in a form called Zyban to treat tobacco use.
9  Q. And you were told that she had tried that?
10 A. Yes.
11 Q. It then goes on to say social, is that drinker?
12 A. Social alcohol, E-T-O-H. Yes, alcohol.
13 Q. Then it goes on to say, "When goes out to
14 dinner"?
15 A. Yes.
16 Q. How did this come up in the discussion with
17 respect to social history?
18 A. Social history, I assess patient's use of
19 alcohol, drugs, tobacco-related products, their living
20 circumstances generally.
21 Q. And then it goes on to say, "Has been through
22 PACE 11-12 years for alcoholism." What do you recall
23 discussing about that?
24 A. I advised her to avoid alcohol.

Page 43

1  Q. But what did she tell you with respect to PACE
2  and the 11-12 years?
3  A. She said that she had been through PACE 11 to 12
4  years for alcoholism.
5  Q. 11 to 12 years ago? 12 years prior?
6  A. I don't know.
7  Q. So you don't know if it means a continuing
8  treatment or whether it was a single treatment 11 or 12
9  years ago; is that correct?
10     MS. SUTTON: Objection to the form.
11 BY MR. CRONIN:
12 Q. I'm just trying to figure out what the 11-12
13 years refers to, whether it means she had been going to
14 PACE on an ongoing basis or whether it meant she had gone
15 through PACE 11-12 years ago or something else?
16 A. I believe I was trying to indicate in my record
17 that it had been 11 to 12 years ago.
18     MR. CRONIN: Okay. I appreciate your
19 efforts here today, Dr. Jackovic. And I know it's
20 difficult with respect to the parties' differences and
21 views with respect to the discoverability of certain
22 medical records.
23     As I stated before, there are pending
24 motions in the case. And we may need to reconvene at