1    MS. SUTTON:  Well, Your Honor, it's

2    my understanding under HIPAA, that it puts on the

3    Courts the responsibility to look at the

4    documents to determine if it's relevant to the

5    litigation, or if it's something that's so

6    personal and irrelevant that it shouldn't be

7    disclosed.

8    THE COURT:  A request was never made

9    by the plaintiff in any of the submissions I

10   received.

11   MS. SUTTON:  It was in the second.

12   THE COURT:  It was in the second?

13   MS. SUTTON:  In the second, Your

14   Honor.  I said that under Gatewood, that what the

15   Court says is that when there's an issue like

16   this --

17   THE COURT:  Where did plaintiff make

18   that request?

19   MS. SUTTON:  Paragraph 5, Your

20   Honor.

21   I set forth the standard.

22   THE COURT:  You set forth the

23   standard, but the question I have is:  When did

24   you make that request?

```
 1              What DI number?

 2              MS. SUTTON:  The DI?

 3              THE COURT:  The DI number for the

 4    documents that you're relying upon.

 5              MS. SUTTON:  It was filed on

 6    December 20th, 2004.  Your Honor, I don't have

 7    the DI number.

 8              I just have the copy.

 9              THE COURT:  December 20th?

10              MS. SUTTON:  Yes, Your Honor, 2004.

11    It's my opposition of plaintiff to motion to

12    compel the support of cross motion.

13              THE COURT:  Opposition on behalf of

14    plaintiff in support of cross motion protective

15    order.  Okay.

16              MS. SUTTON:  It's when I'm

17    requesting protective order on our third motion

18    to compel be denied.  And in Paragraph 5, I set

19    forth the standard.

20              THE COURT:  Yeah.  I understand

21    that.

22              MS. SUTTON:  Indiana Court.

23              THE COURT:  I understand that, but

24    where it was requested in the submission that the
```

1    Court -- your request was basically that the

2    motion for a protective order be granted and

3    WPA's motion to compel be denied.

4              There was never a request for an

5    alternative for this Court to do an in camera

6    review.

7              MS. SUTTON:  Your Honor, I thought

8    that was part of the protective order, that's how

9    the Court would --

10             THE COURT:  Not necessarily.  It's

11   not necessarily automatic, uh-uh.

12             For the protective order situation,

13   no.  It says in here, and I read through them --

14   I read through the case, and I reviewed that

15   particular matter.  And I recognize the Gatewood

16   case.

17             MS. SUTTON:  Yes, Your Honor.

18             THE COURT:  In the Gatewood case,

19   the Court emphasized the fact that there were

20   significant damages for -- requested for past and

21   future mental and emotional anguish as well as

22   for loss of income, the damage area.

23             And the Court found that generally a

24   defendant is entitled to discover whether there

```
 1    have been other stressors relating to plaintiff's

 2    medical and physical health during the relevant

 3    period, which may have contributed to the claimed

 4    emotional distress.

 5             This is not diminished by the fact

 6    that a plaintiff has not sought medical or mental

 7    health care for the emotional distress resulting

 8    from the claimed discrimination.

 9             They felt there was a need for a

10    temporal scope of discovery, and interestingly

11    this dealt with a matter in which the defendant

12    went back to January 1st, 1985 to make the

13    request.  And the Court limited the information

14    since January 1st, 1990.

15             At its request, I think the

16    plaintiff was -- that the Court decided to do a

17    review in camera with specific records which

18    plaintiff claimed its privacy interest outweighed

19    defendant's need.

20             For the record, that request, I

21    didn't read in any of the submissions, to me was

22    being made by the plaintiff.

23             MS. SUTTON:  I apologize if I wasn't

24    clear, Your Honor.  In Paragraph 5, what I put is
```

```
 1    in the Gatewood case that the Court stated that

 2    when there's a broad request for plaintiff's

 3    medical records, that -- and it says that the

 4    Court should review the records in camera to

 5    determine whether the plaintiff's interest in

 6    maintaining privacy of the information outweighed

 7    the need of the defendant to discover it.

 8              And it said that there should be

 9    temporal and substantive limits that are imposed

10    on medical records when there's just a broad

11    scope for every record.

12              THE COURT:  I understand that.  I

13    certainly am not indicating that anything past

14    2004 was necessarily discoverable.  That's not an

15    issue that's been brought before me.

16              We have an incident.  We have a

17    situation where your client was discharged from

18    her employment, as is alleged, based upon, as

19    alleged by the plaintiff, based upon seeking FMLA

20    rights in the 2002 time period.  And we're

21    talking 2004.

22              We're talking about a case in which

23    there's evidence to suggest that there was

24    continued prescription of antidepressants,
```

```
 1    antidepressant medications after that temporal,

 2    small temporal time period that your experts say

 3    was directly related to your client's -- was

 4    directly related to the fact that the client was

 5    discharged from her employment.

 6                    But left unexplained to me is why is

 7    there a continued prescription for a medication

 8    and antidepressant, and how your experts can

 9    distinguish between that temporal incident versus

10    maybe an ongoing condition.

11                    MS. SUTTON:  Okay.  Well, I have the

12    records, Your Honor, so I can give them to him

13    after this hearing.

14                    THE COURT:  And when it will be done

15    is -- let me tell you what my other concern in

16    that, about reviewing the records is this:

17    You're going to ask me to make a determination as

18    to the relevance.  I certainly am not a medical

19    person.

20                    I could make a determination as to

21    whether it appears that they're privileged under

22    the doctor patient, but I've already decided that

23    even if they are, I think that privilege may have

24    been -- I feel that privilege has been waived.
```

1          Certainly, in any protective order

2    situation should Mr. Cronin have his expert

3    review, or any expert, or any person he intends

4    to use as an expert, either as a consulting

5    expert or expert he intends to use at trial, sign

6    off and recognize that they cannot discuss or

7    cannot disclose any further those records than

8    beyond this litigation.

9          And as I said before, I have made no

10   determination today as to whether any of this

11   information as a result is going to be admissible

12   at trial.

13         It may turn out that there's -- that

14   it's not.  I don't know.

15         Because I don't know at this stage

16   of the game with discovery in the stage that it's

17   at or discovery still ongoing what issues are

18   going to end up being in front of a jury or in

19   front of a judge.  The fact that the pretrial --

20   I don't know whether or not the Court would be

21   able to make an absolute ruling at that time.

22         But I certainly am not suggesting

23   that you can't raise an objection as to

24   admissibility for a number of reasons under the

```
 1    Federal Rules of Evidence.  I'm not making any

 2    decision in that regard.

 3            I am saying in the discovery

 4    situation, which is a much broader matter, that

 5    Mr. Cronin's entitled to see these.  As an

 6    attorney, he should recognize his obligation that

 7    this is not something that you suddenly broadcast

 8    out.

 9            If you want to have them -- they are

10    certainly not going to be filed with the Court so

11    that they would necessarily be open, just the

12    response or the indication that you completed

13    that needs to be known.

14            So you've got the protection there

15    that it's not going to be part of the Court

16    record.  The documents themselves will not be

17    part of the Court record.

18            So I'm trying to do this all under

19    the protective order situation.  My concern about

20    reviewing the documents to find out whether it's

21    an invasion, that's why I went over the case.

22            Of course, it is.  Any time I

23    thought -- well, of course, it is.  Any time --

24    any time you're asking for somebody's medical
```

 1    records, its's an invasion of a privilege.  The

 2    whole purpose, though, of what I'm determining

 3    today, just like when you try to determine has

 4    the attorney-client privilege been waived, has

 5    the attorney work product doctrine privilege been

 6    waived, and considering that the Federal Rules of

 7    Evidence don't have any 500 numbers, because we

 8    look to the states.

 9               I am determining that for this

10    purpose that for the issue on damages, that for

11    the issue as to whether your client's continued

12    work expectancy was going to be on this matter, I

13    am determining that defendant's entitled to this

14    information.  That's all I'm determining.

15               MS. SUTTON:  Now, the only question

16    that I have, Your Honor, is Wilmington

17    Professional Associates is a big company.

18    There's over --

19               THE COURT:  I'm not suggesting that

20    Wilmington Professional Associates or anybody

21    there has access to it.

22               MS. SUTTON:  That's what I wanted to

23    make clear.

24               THE COURT:  Okay.  I'm not

1    suggesting that they would.

2                 MS. SUTTON:  Okay.

3                 THE COURT:  Certainly if there is

4    going to be somebody there that would -- I know

5    that neither one of you probably have done

6    protective orders.

7                 MS. SUTTON:  I have done some.

8                 THE COURT:  You have done protective

9    orders.  I mean saying that you've done

10   protective orders, how I see it is kind of what

11   happens in patent cases, because we have

12   protective orders instantaneously in patent

13   cases.

14                 And usually what the arrangement is,

15   and I am not saying you have to do it this way,

16   but usually the first tier is trial counsel.

17   And, obviously, anybody that trial counsel

18   consults as a consulting expert or an expert they

19   intend to use at trial with the obligation of

20   trial counsel and their staff, obviously, because

21   otherwise it would be impossible to be completely

22   in a vacuum, so they understand and are told.

23                 And it's the affirmative obligation

24   on the part of counsel that is receiving this

```
 1    record to make sure that those individuals are

 2    informed of their obligation, that is, that it's

 3    only used in this case.  It's only used in a

 4    litigation form.

 5              Now, what happens if there is a need

 6    to talk to the client about it?  For example,

 7    does the client at WPA have in-house counsel?

 8              MR. CRONIN:  It does not have

 9    in-house counsel, Your Honor.

10              THE COURT:  Does it have somebody

11    that has in-house HR?

12              MR. CRONIN:  Yes, Your Honor.

13              THE COURT:  If it turns out -- this

14    is a suggestion.  I'm not saying it has to go

15    this route.

16              But I'm willing to consider

17    something that we'll sign off on the protective

18    order.  If Mr. Cronin needs to talk to his client

19    about this, there could be a designated vein only

20    that individuals, and those individuals then

21    would sign an acknowledgement saying that they

22    understand what their obligations are under the

23    protective order and will not disclose to anybody

24    else, but only in discussion with Mr. Cronin.
```

```
 1              That's the reason why I threw out

 2    in-house counsel or somebody that's in HR and

 3    human resources, things like that, and have a

 4    limited group.  But I certainly expect your

 5    office to be able to discuss it with your people

 6    in your office.  I certainly expect Mr. Cronin to

 7    be able to discuss it with his paralegals, his

 8    consulting expert, and his expert witnesses, just

 9    like that.

10              MS. SUTTON:  We were mostly

11    concerned about it being disseminated.

12              THE COURT:  No.  That's what a

13    protective order is made to suggest.  I am making

14    a suggestion how it can be.

15              I'm more than willing to listen to

16    anything that either side has regarding that.

17    But my first suggestion is the two of you work

18    one out and provide it.

19              But as of today, it is under a

20    protective order right now as far as this Court

21    is concerned, that it will only be used in this

22    litigation, that it will not be disseminated or

23    disclosed to anybody at WPA without first

24    obtaining -- without first notifying counsel for
```

1    the plaintiff and without first obtaining,

2    identifying who that person is for limited

3    reasons, and that person signing off on the

4    documented knowledge that they understand their

5    obligations, either under HIPAA or what this

6    Court's rulings are.

7              Do you have the abbreviation for

8    HIPAA?

9              THE REPORTER:  Yes.

10             MS. SUTTON:  You mean the name?

11             THE COURT:  No.  I'm asking -- no, I

12   got the name of it.  I just understand the

13   abbreviation that it's double A.

14             MS. SUTTON:  It's H-I-P-A-A.

15             THE COURT:  Yeah.

16             MR. CRONIN:  Your Honor, for the

17   record, we have absolutely no problem with a

18   qualified protective order.  In fact, in our

19   answering brief in response to the first motion

20   to quash the subpoena, we proposed that in

21   Footnote 4 on Page 11.

22             And certainly --

23             THE COURT:  Well, I don't know

24   whether you made any -- a proposal as to what it

1    would say, Mr. Cronin.  I know that we had talked

2    about it.

3              MR. CRONIN:  Sure.

4              THE COURT:  But a protective order

5    goes a long way in solving a lot of things.  For

6    example, privilege in trade secrets, they're

7    probably on the same level as what protection a

8    Court will provide.  But I do think the

9    privilege, quite frankly, gets waived to a large

10   extent once the issue is put into the case.

11             And I'm not suggesting a broad it

12   goes on forever, but I do think that for a doctor

13   to come to the conclusion that there was a finite

14   period and testify that it wasn't to include

15   2004, it's very interesting.

16             All right.  Is there anything left?

17             MR. CRONIN:  There are a couple

18   points that I'd like to raise, if I could, Your

19   Honor.

20             The first concerns the supplemental

21   expert report that Ms. Sutton referred to from

22   Mr. Bunin.  The amount that the plaintiff is now

23   claiming in economic damages is approximately

24   doubled.  It's about $400,000 now.

40

```
 1              THE COURT:  It's based on -- and

 2   what's that based upon?

 3              MR. CRONIN:  Based on the fact that

 4   she was terminated from DMMS.  And as a result,

 5   she was first demoted and received lower pay.

 6              And then she was terminated.  And he

 7   is making certain statements about -- he's added

 8   an assumption that they'll be able to find other

 9   employment within six months.

10              And I guess based upon that, that

11   part of his opinion is that WPA would be

12   responsible for paying her that six-month period

13   it takes her to find a job.

14              And there's another assumption

15   that's really critical to the second report, and

16   that is that she never would have incurred these

17   additional damages if she had stayed at WPA

18   because WPA is covered by the FMLA.  And

19   apparently DMMS is not.

20              And obviously, under the FMLA,

21   somebody can claim FMLA qualified leave for up to

22   12 weeks a year.

23              THE COURT:  In a 12-month period?

24              MR. CRONIN:  That's right.
```

```
 1                 THE COURT:  That is what is

 2   important about it.

 3                 MR. CRONIN:  It is.  That is right,

 4   but that's a rolling period.

 5                 THE COURT:  It's a rolling period.

 6                 MR. CRONIN:  Certainly WPA does it

 7   from the time that it's first used.

 8                 THE COURT:  Yeah.

 9                 MR. CRONIN:  Now, the problem that I

10   have from reconstructing things, we received a

11   lot of documents.  We got this report from

12   Mr. Bunin two days after, Your Honor, we had that

13   teleconference.

14                 Subsequent to that, we received a

15   number of documents from DMMS, not all the

16   documents, but some of the documents.  And just

17   yesterday, we got documents from the Division of

18   Unemployment Insurance.

19                 I have tried through those documents

20   to try to piece together just how much time Ms.

21   Spoltore has missed.  And based on just a rough

22   calculation, starting about April of '04 through

23   a recent hospitalization ending in January, that

24   it could be as many as 14 weeks.
```

 1          I also note that in some of the

 2    statements in the materials from the Division of

 3    Unemployment Insurance that both DMMS and

 4    Ms. Spoltore stated that there's an expectation

 5    that she's going to miss several months in the

 6    future.  Months.  Not weeks, not days, months.

 7          So one of the things that we think

 8    we need to do, one thing that hadn't been

 9    addressed yet is certainly continue the

10    deposition of Ms. Spoltore and certainly get her

11    to answer the questions that she was either

12    directed not to or did -- otherwise didn't

13    answer, but also find out what the likelihood is

14    of her working again.

15          And as a result, I think we're

16    probably going to want to take and --

17          THE COURT:  Well, this case was

18    brought under the ADA and the ADEA.

19          MS. SUTTON:  And the FMLA and the

20    State law.

21          THE COURT:  So under the ADA, a

22    person is not considered to be a qualified

23    disabled individual if they can no longer work.

24    In other words, if it turns out that whatever

```
 1    health or whatever health problem they suffered

 2    from, significantly -- not only significantly,

 3    but if somebody's not able to return to work for

 4    a problem, does not -- they're no longer a

 5    qualified individual under the ADA.

 6                 Different proofs obviously exist

 7    under the ADEA act.  And then I guess with it

 8    would also --

 9                 MS. SUTTON:  FMLA.

10                 THE COURT:  Different proofs, but it

11    kind of runs into the FMLA.

12                 MS. SUTTON:  And Your Honor, the

13    loss of unemployment was recent, and I have no

14    objection to him going over these new issues

15    since they are, you know, new arising.

16                 I think part of the question of this

17    is whether there's going to be a problem if he

18    starts asking her about the problem that has

19    developed, if this is a continuation of what

20    developed in 2004.

21                 I think Your Honor just ruled that

22    it's not privileged anymore.

23                 MR. CRONIN:  Okay.

24                 THE COURT:  Yeah.
```

```
 1              MR. CRONIN:  Okay.
 2              THE COURT:  But I mean, are we
 3   saying this is a -- continuing from 2004, that is
 4   happening now?
 5              MS. SUTTON:  Yes.
 6              MR. CRONIN:  Okay.
 7              The one other deposition at this
 8   point that I think we may want to take is one of
 9   DMMS, just because I'm not clear based on some of
10   their records what occurred with respect to when
11   she was --
12              THE COURT:  I haven't restricted
13   that.  What I said is that was -- you're going to
14   be able to take -- well, I didn't say this.
15              You're going to be able to take the
16   plaintiff's deposition, but I think it was
17   implied that you are going to be able to take the
18   two experts' depositions, and follow up with them
19   about their conclusions that you weren't able to
20   see, and get a copy of what you weren't able to
21   see.
22              What I've said is that in light of
23   this, I'm not making you responsible to pay for
24   their fees.  But I'm also not giving your fees or
```

```
 1    costs for filing those motions, either.
 2              That will be plaintiff's
 3    responsibility with their experts.  Discovery is
 4    a period for -- discovery cut-off, is it gone?
 5              MR. CRONIN:  It's been long cut off.
 6    But at this point, Judge Farnan entered an order
 7    vacating the trial date, vacating the pretrial
 8    conference.
 9              THE COURT:  Well, considering that
10    both of you -- I think both sides have probably
11    expanded what time period they needed for
12    discovery, in other words, by sending expert
13    reports, things like that at a later time,
14    according to the schedule the question is whether
15    you have a schedule anymore.
16              MR. CRONIN:  Not --
17              MS. SUTTON:  I don't believe the
18    expert reports were past the date that they were
19    due.  We did submit that.
20              The problem that we had was because
21    these issues hadn't been resolved everything --
22              THE COURT:  Continuing with an
23    ongoing problem, you had to continue with
24    discovery --
```

```
 1              MS. SUTTON:  Right.

 2              THE COURT: -- when they were

 3   originally filed.

 4              MS. SUTTON:  With -- it was

 5   September.

 6              THE COURT:  When all those motions

 7   were originally filed, the discovery was still --

 8              MS. SUTTON:  Yes.

 9              THE COURT: -- open.  Okay.

10              MS. SUTTON:  It was still open.

11   They were first filed in September, Your Honor.

12              THE COURT:  Yeah.  And then they

13   sort of grew on each other?

14              MS. SUTTON:  That's what happened.

15   They just escalated, but we got our expert

16   reports in on time, you know, within that

17   deadline period.

18              THE COURT:  Well, the question is --

19              MS. SUTTON:  After that, she --

20   after the date the expert reports were due,

21   Ms. Spoltore lost her employment which caused --

22              THE COURT:  A supplemental to Rule

23   26(e) issue to arise for you.

24              MS. SUTTON:  Right.  Because of the
```

```
 1    circumstances, and it also raised issues with

 2    respect to discovery on defendant's part.

 3              THE COURT:  Okay.  Yeah.

 4              Which means, I guess, also that,

 5    Mr. Cronin, are you going to be supplementing

 6    your experts?

 7              MR. CRONIN:  Your Honor, at this

 8    point, we don't have any experts.  I mean, the

 9    experts that they've offered, they've offered one

10    I guess on liability dealing with diagnostic

11    coding issues.  And we've scheduled her

12    deposition for a couple weeks from now.

13              I don't know whether we would

14    designate an opposing expert.

15              THE COURT:  And the rest are damages

16    experts?

17              MR. CRONIN:  That's right.  Until we

18    get the record, we thought it was not prudent to

19    go ahead and obtain an opponent on what's been

20    provided.

21              THE COURT:  Are you looking -- is

22    the question that counsel is raising right now --

23    are you looking to me to put in a schedule?  I'm

24    not certain I can, because I think the only thing
```

```
1     that was really referred to me was to handle the
2     discovery, outstanding discovery issues.
3                   And I'm loathe to put in a schedule
4     of -- a discovery schedule in another judge's --
5     on another judge's calender.
6                   MS. SUTTON:  Your Honor, could we
7     request that they refer the discovery issues to
8     you, so that you can do a scheduling order?  I
9     think we need an order, Your Honor.
10                  THE COURT:  I think you do.  I think
11    you definitely do need time periods.
12                  What I would suggest to you is the
13    two of you work together to get that -- you see,
14    you don't have a trial date.  You don't have a
15    pretrial date.
16                  I'm not trying to suggest, and the
17    last thing I want to do is push this case off to
18    the Netherlands and to have Heaven knows when,
19    you know, you'll get to trial.
20                  But I do think counsel's probably
21    more in tune as to what is going to be needed and
22    what time frame you're going to need to complete
23    the discovery that I've already said by granting
24    the motions on behalf of the defendant and
```

```
 1    denying the protective order, at least at this
 2    stage, or the motion to quash and the protective
 3    orders at this stage for the plaintiff.  But you
 4    know it probably would be better if I knew what
 5    the time frame is going to be.
 6                Is it going to be 45 days, 60 days,
 7    90 days that you think you need to get this
 8    stuff?  Because if Mr. Cronin is going to be
 9    producing expert reports, I'm sure you're going
10    to want to see those reports.
11                And I warn you, Mr. Cronin, that
12    what's good for the goose is going to be good for
13    the gander.  Excuse the expression.
14                That whatever your expert reviews,
15    counsel for the plaintiff is going to be entitled
16    to know what that is and made available to her.
17                MS. SUTTON:  Well, Your Honor, with
18    respect to the three depositions that are needed,
19    and then my -- I assume he's going to produce a
20    damages expert.
21                It's my understanding -- I mean,
22    there's no reason why he should be permitted to
23    produce a liability expert.  He's had our
24    liability expert report for months.
```

```
 1              THE COURT:  Oh, that one?  I wasn't
 2    ruling on that.
 3              I wasn't making any determination in
 4    that regard.
 5              MS. SUTTON:  Oh, I just wanted -- it
 6    sounded like he could.
 7              THE COURT:  No, I am -- I know I
 8    wasn't suggesting that.
 9              I was saying that if there were
10    expert reports and I used the words if --
11              MS. SUTTON:  Right.
12              THE COURT: -- the expert reports
13    produced by Mr. Cronin, and even if they're
14    allowed, what I'm saying is I think counsel has a
15    better feel as to the time period you're going to
16    need.
17              MS. SUTTON:  And it's my experience
18    that Dr. Jackovic and Dr. Kaye are very quick to
19    respond.  I don't think it will take very long to
20    schedule the deposition.
21              THE COURT:  Probably not.  I don't
22    think the depositions themselves should take very
23    long, because it's a limited area of disclosure.
24    But I also think Mr. Cronin is entitled to see
```

```
 1    what those reports were before.

 2               MS. SUTTON:  I agree.  Ms. Spoltore

 3    is presently available for deposition.

 4               THE COURT:  Sure.

 5               MS. SUTTON:  At any time our

 6    schedule will be agreeable, so I don't think it's

 7    going to take more than 45 days at most to get

 8    everybody.

 9               THE COURT:  What I am asking for is

10    for the two of you to work out a schedule

11    yourself, submit it, and I'll sign off on it.

12    I'll sign off on it.

13               MS. SUTTON:  Do we send a letter to

14    request, to ask that you --

15               THE COURT:  Send a letter to the

16    judge.  It wasn't clear to me.

17               I don't even know if he made a

18    formal referral.  Did he?

19               MR. CRONIN:  He did, Your Honor.

20    And actually I think, in fact, on the electronic

21    docket, it appears to suggest the whole case has

22    been referred to you.

23               THE COURT:  This is also off the

24    record.
```

```
 1                    (Following a discussion held off the

 2         record:)

 3                    THE COURT:  So come together with a

 4         proposal, and what I'm going to also suggest

 5         counsel do is just to look and see if Judge

 6         Farnan only referred for this matter.  If he made

 7         a more general referral for the discovery issues

 8         without specifying these outstanding issues, then

 9         I think I can sign off on them.

10                    MR. CRONIN:  I just can't recall

11         exactly.

12                    THE COURT:  I can't, either.  And I

13         have no guarantee I received a copy of that

14         order.  I got an E-mail back from him when I said

15         to him, I'll handle these if you want.  Just do

16         an order.

17                    And he said, Thanks.  I'll do an

18         order.

19                    But I can't remember if I ever saw

20         the order, if I ever got the order.

21                    MR. CRONIN:  It took a little while.

22                    THE COURT:  He said -- he said, Do

23         it, and I said, Fine.  That was enough for me.

24                    And I apologize for the temperature
```

 1   in this courtroom, or the fact that we have so

 2   much air flowing through.

 3            Have we covered all the issues?

 4            MS. SUTTON:  I think we have.

 5            MR. CRONIN:  I think at this point,

 6   Your Honor, that's correct.

 7            THE COURT:  Okay.  I generally do

 8   not do a separate order that outlines everything

 9   we discuss, because I've learned that when I do

10   that if I don't say it precisely the way I did in

11   the courtroom in the order and word it a little

12   differently, we run into the problem.

13            So it will be the obligation of

14   counsel to get a copy of the transcript.  What I

15   will do is indicate that the transcript shall

16   serve as an order of this Court addressing the

17   following outstanding motions and listing their

18   DI or their docket entry numbers.

19            MR. CRONIN:  Okay.

20            THE COURT:  Okay.

21            MS. SUTTON:  That's fine, Your

22   Honor.

23            THE COURT:  Thank you.

24            MR. CRONIN:  Thank you, Your Honor.

```
1                    THE COURT:  Thank you.  Anything
2       else?
3                    MR. CRONIN:  Not at the moment, Your
4       Honor.  No.
5                    MS. SUTTON:  No.
6                    THE COURT:  Okay.
7                    MS. SUTTON:  Thank you, Your Honor.
8                    (Court was recessed at 11:15 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1   State of Delaware    )
                          )
 2   New Castle County    )

 3

 4

 5              CERTIFICATE OF REPORTER

 6

 7          I, Heather M. Triozzi, Registered

 8   Professional Reporter, Certified Shorthand

 9   Reporter, and Notary Public, do hereby certify

10   that the foregoing record, Pages 1 to 55

11   inclusive, is a true and accurate transcript of

12   my stenographic notes taken on April 7th, 2005,

13   in the above-captioned matter.

14

15          IN WITNESS WHEREOF, I have hereunto

16   set my hand and seal this 11th day of April,

17   2005, at Wilmington.

18

19

20                 _____

21                 Heather M. Triozzi, RPR, CSR

22

23

24
```