**REDACTED JUNE 8, 20005 LETTER
TO MAGISTRATE JUDGE THYNGE**

**EXHIBIT 2**

# BUNIN ASSOCIATES
### Actuarial-Economic Consultants

**DAVID T. BUNIN, FSA**
**ROYAL A. BUNIN, MBA**

THE WYNNEWOOD HOUSE, SUITE 109
300 EAST LANCASTER AVENUE
WYNNEWOOD, PA 19096

PHONE: (610) 642-4700
FAX: (610) 642-4787
E-Mail: BuninAssoc@aol.com

March 18, 2005

Kimberly D. Sutton, Esq.
**Obermayer, Rebmann, Maxwell & Hippel, LLP**
20 Brace Road, Suite 300
Cherry Hill, NJ 08034

**Re: Andrea Spoltore**

Dear Ms. Sutton:

Enclosed is our updated actuarial-economic report on Andrea Spoltore (formerly known as Andrea Cadwallader), which was originally prepared on November 20, 2003. All opinions expressed in this report are held to a reasonable degree of actuarial and economic certainty. Upon receiving any additional information, we will amend our report accordingly.

Our statement for services rendered is also enclosed. Please let us know if you have any questions.

Very truly yours,

Royal A. Bunin, M.B.A.

David T. Bunin, F.S.A.

RAB:DTB/gk
Enclosures

# BUNIN ASSOCIATES
### Actuarial-Economic Consultants

DAVID T. BUNIN, FSA
ROYAL A. BUNIN, MBA

THE WYNNEWOOD HOUSE, SUITE 109
300 EAST LANCASTER AVENUE
WYNNEWOOD, PA 19096

PHONE: (610) 642-4700
FAX: (610) 642-4787
E-Mail: BuninAssoc@aol.com

March 18, 2005

Kimberly D. Sutton, Esq.
**Obermayer, Rebmann, Maxwell & Hippel, LLP**
20 Brace Road, Suite 300
Cherry Hill, NJ 08034

**Re: Andrea Spoltore**

---

For Professional Services Rendered:

   Updated Report dated March 18, 2005............$750

For your bookkeeping records, our EIN # is 23-2868976

# BUNIN ASSOCIATES
## Actuarial-Economic Consultants

DAVID T. BUNIN, FSA  
ROYAL A. BUNIN, MBA

THE WYNNEWOOD HOUSE, SUITE 109  
300 EAST LANCASTER AVENUE  
WYNNEWOOD, PA 19096

PHONE: (610) 642-4700  
FAX: (610) 642-4787  
E-Mail: BuninAssoc@aol.com

## UPDATED
## ACTUARIAL-ECONOMIC REPORT

Loss of Earning Capacity  
& Fringe Benefits

of

Andrea Spoltore

Prepared by:

*Royal A. Bunin*  
Royal A. Bunin, M.B.A.

*David T. Bunin*  
David T. Bunin, F.S.A.

Prepared for:

Kimberly D. Sutton, Esq.  
**Obermayer, Rebmann**  
**Maxwell & Hippel, LLP**  
20 Brace Road, Suite 300  
Cherry Hill, NJ 08034

March 18, 2005

Andrea Spoltore

**BACKGROUND**

Andrea Spoltore was born on November 5, 1947 and is, therefore, currently 57.3 years of age.

Ms. Spoltore was terminated from her employment with Wilmington Professional Associates, Inc., on March 6, 2002. At the time of her termination, she was being paid at the rate of $20.50 per hour. Based upon tax returns, Ms. Spoltore's earnings for the last two full calendar years of employment with Wilmington Professional Associates were as follows:

| Year | Earnings |
|------|----------|
| 2000 | $39,240  |
| 2001 | $40,505  |

According to the Employee Policy Handbook from her former employer, Wilmington Professional Associates, Inc., Ms. Spoltore would receive cost of living allowances based upon increases in the Consumer Price Index in the previous year. For the calendar year, 2002, the Handbook indicated that the rate increase would be at the rate of 2.6%. The Employee Policy Handbook also indicated that Ms. Spoltore had 8 paid holidays, 45 hours of personal/sick time, and received overtime for work in excess of 40 hours per week. Personnel records indicate that Ms. Spoltore also received 112.5 vacation hours per year, in addition to bonus income. For the calendar years 1999, 2000 and 2001, such bonus income was in the amounts of $1,000, $1,200 and $1,225, respectively.

In addition to her regular cash earnings and bonus income, Ms. Spoltore also received various fringe benefits including health coverage, dental, life insurance, short term and long term disability, and she participated in a pension and a profit sharing plan. With respect to her pension and profit sharing plan, documents indicate that at the time of her termination, Ms. Spoltore was 80% vested in these two plans. The values of the investment in these two plans, as of September 30, 2002, were in the amounts of $9,467.81 for the Money Purchase Pension Plan, and $7,300.46 in the profit sharing plan. As she was 80% vested, Ms. Spoltore received 80% of the two aforementioned figures, thereby losing 20% of the total amounts in the two different accounts. Accordingly, she lost $1,894 from the Money Purchase Pension Plan and $1,460 from the profit sharing plan.

Andrea Spoltore

## BACKGROUND
### (Continued)

Ms. Spoltore obtained alternate employment beginning in mid May 2002, working at Delaware Medical Management Services (DMMS). Her starting pay was in the amount of $32,000 per year, and she received a 3% increase in her pay in January of 2004, retroactive to her anniversary date of May 2003. This would be an increase to an annual rate of $32,960 per year. While Ms. Spoltore received vacation and sick time, she did not receive short term nor long term disability coverage, and had to wait twelve months before being eligible to participate in the pension plan. She also had a ninety day waiting period before she could become eligible to participate in the medical plan, which included health coverage, vision and prescriptions. With respect to the pension plan at DMMS, documents indicated that the employer contributions were based upon 3% of the employee's salary. The employee is automatically vested in the employer's "safe harbor" 3% of salary contributions, however, such vesting in their own contribution is delayed. After being in the plan for six years, the employee would be 100% vested.

Ms. Spoltore returned from a medical leave on September 1, 2004 and had a change in her job assignment that was also accompanied with a decrease in her compensation down to $11.50 per hour. She remained at this decreased pay level until she was terminated from DMMS on December 20, 2004. It has been indicated that DMMS has fewer than 50 employees, and therefore, did not fall within the provisions of the Family and Medical Leave Act. Therefore, her employer, DMMS, was not obliged to hold Ms. Spoltore's position open when she took her leave for medical reasons in August of 2004. Upon her return, the only position that was offered to her was the decreased paying job as described above. Had she not been terminated and was still employed by Wilmington Professional Associates, Ms. Spoltore would not have suffered these losses. In addition, at her employment at Wilmington Professional Associates, Ms. Spoltore worked four days per week, having Fridays off. According to the schedule of days in which Ms. Spoltore did not work at DMMS, either full days or partial days, many of those dates fell on a Friday, and there were numerous dates in which she received no compensation. Given the number of personal/sick days at her previous employment with Wilmington Professional Associates, and her vacation time, and having Fridays off, Ms. Spoltore would not have suffered such losses during the medical leave in the Summer of 2004.

Andrea Spoltore

## BACKGROUND
### (Continued)

Ms. Spoltore is currently looking for employment in her chosen profession. It has been indicated that she is looking for a job paying approximately $13 per hour, or on an annualized basis, $27,040 per year, and she anticipates obtaining such employment in approximately six months.

Based upon her tax records, in the year 2002 following her termination, Ms. Spoltore's earnings from her alternate employment at DMMS were in the amount of $20,190. 2004 W-2 Wage and Tax Statements indicate that she earned $26,587 up until the time of her termination in December of 2004.

Based upon the above, the value of the past lost earnings (back pay) will be calculated as the difference between the earnings which Ms. Spoltore would have earned in her previous position with Wilmington Professional Associates, and deducting mitigation earnings from DMMS. With respect to the future lost earning capacity (front pay), an allowance will be given for Ms. Spoltore obtaining a position in her field as a medical billing representative, earning her anticipated rate of pay of $13 per hour beginning in approximately six months. This would result in annual earnings of $27,040 per year, and will be used as mitigation earnings against what she would have been earning at Wilmington Professional Associates, had she not been terminated.

In addition, there would also be a loss of fringe benefits.

Andrea Spoltore

## LIFE EXPECTANCY

As stated previously, Ms. Spoltore is currently 57.3 years of age. The life expectancy as of the current date is 22.3 additional years, based upon the Unisex Life Tables, utilized by the New Jersey Court System.

Adding the life expectancy of 22.3 years to the current age of 57.3 years results in an expected life span of 79.6 years.

## WORK-LIFE EXPECTANCY

The work-life expectancy as of the current date is 8.7 years, based upon retirement at age 66, which is the age Ms. Spoltore would become eligible to receive full Social Security retirement benefits.

-4-

Andrea Spoltore

## PAST LOST EARNINGS

The past lost earnings are measured from the date of termination to the current date, utilizing an appropriate measure of the lost earnings for that period.

At the time of her termination in March of 2002, Ms. Spoltore was earning an hourly rate of $20.50 per hour. Her tax records indicate that in the last full calendar year of employment, 2001, she had earned $40,505. She would have received a cost of living allowance in 2002 of 2.6%, which is based upon the Consumer Price Index (inflation), for the previous calendar year. Utilizing this rate of increase of 2.6% on her total earnings for the year 2001 would result in total annual earnings for the year 2002 of $41,558. Cost of living allowances beyond 2002, according to the Consumer Price Index for the calendar years 2002, 2003, 2004 (based upon statistics published by the U.S. Department of Labor, Bureau of Labor Statistics) would be at the rates of 1.6%, 2.3%, and 2.7%, for the years 2003, 2004 and 2005, respectively. Accordingly, after allowing for cost of living allowances based upon the Consumer Price Index, the projected current rate of earnings for Ms. Spoltore would be in the amount of $44,360 per year.

As indicated in the Background section of this report, Ms. Spoltore obtained alternate employment in May of 2002, with a starting salary in the amount of $32,000 per year, working at DMMS. In January 2004, she received a 3% salary increase retroactive to her anniversary date of May 2003, thereby increasing her annual rate of earnings to $32,960 per year. Following her leave for medical reasons in August of 2004, Ms. Spoltore returned to DMMS earning at a reduced rate of $11.50 per hour, and remained so employed until she was terminated in December of 2004.

On this basis, and allowing for increases in earnings, and deducting the amount of money already earned, the total past lost earnings, measured from the date of termination through the current date, would be in the amount of $49,548.

-5-

Andrea Spoltore

## FUTURE LOST EARNING CAPACITY

The future lost earning capacity is measured from the current date throughout the duration of the work-life expectancy period, taking into consideration future mitigation earnings at the rate of $13 per hour, or on an annualized basis, $27,040 per year. As indicated in the Past Lost Earnings section of this report, the projected current rate of earnings for Ms. Spoltore's former position is in the amount of $44,360 per year. Consideration is also given for Ms. Spoltore in obtaining such alternate earnings in approximately six months time. Accordingly, the value of the lost earnings and earning capacity will be based upon a loss of $44,360 per year for six months, followed by an annual loss of earnings in the amount of $17,320 per year ($44,360 less $27,040).

The future lost earning capacity is calculated making appropriate allowances for future increases in earnings due to inflation and productivity. It is also necessary to reduce such earnings to present value, that is, to determine the amount of money which, when invested currently, would provide for the future lost earnings.

The calculation of the present value of the earnings which have been increased (by inflation and productivity) can be approximated by a net interest basis, in which the net interest rate is the difference between the interest rate and the sum of the inflation and productivity rates. In some situations, increases in earnings due to price and wage inflation, and productivity, would produce an offset with the appropriate risk-free rate of interest.

The above method is appropriate even if there are future changes in rates of inflation, productivity and interest. Generally, however, the difference between the interest rate less the growth rates (productivity and inflation) tends to be constant and generally equal to approximately 2% per year except in those situations where growth and interest rates produce an offset.

On this basis, the present value of the future lost earning capacity would be in the amount of $158,905.

-6-